United States Court of Appeals,

Fifth Circuit.

No. 93-2367.

HARTFORD CASUALTY INSURANCE COMPANY, Hartford Fire Insurance Company, Hartford Accident and Indemnity Company, Hartford Insurance Company of the Midwest, Hartford Underwriters Insurance Company, and Twin City Fire Insurance Company, Petitioners,

v.

The FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity and in its Capacity As Receiver for Texas Investment Bank, N.A. of Houston, Texas, Respondent.

June 1, 1994.

Petition for Review of an Order of the Federal Deposit Insurance Corporation.

Before HIGGINBOTHAM and WIENER, Circuit Judges, KAUFMAN, District Judge.[*]

KAUFMAN, District Judge.

Plaintiffs ("Hartford") are six corporate entities, each affiliated with the ITT Hartford Insurance Group of Companies. In February 1984, Hartford Accident & Indemnity Co., one of those six entities, furnished a performance bond for Morchem Resources, Inc. ("Morchem") to secure a project undertaken by Morchem for Peoples Gas System, Inc. ("Peoples"), the obligee under the bond. Morchem contracted with Peoples to remove and to dispose of sludge from three low pressure gas holding vessels located in North Miami Beach, Florida. As collateral, Morchem gave Hartford a $492,000 CD issued by Texas Investment Bank, N.A. of Houston, Texas ("TIB") in Morchem's name. On November 15, 1985, Morchem's parent company,

[*]District Judge of the District of Maryland, sitting by designation.

Finultra, issued a promissory note to TIB, pledging the same $492,000 CD as collateral for payment of the note. During oral argument in this case, when asked by this Court about why that November 1985 act took place, none of counsel for the parties was able to provide any explanation.

On January 7, 1987, Hartford Accident & Indemnity Co. and Morchem agreed to substitute six CDs in place of the single $492,000 CD. Each of the six CDs was for $82,000, thus totaling 492,000, and each was issued separately to a different Hartford subsidiary. Counsel for plaintiffs explained during oral argument before us that Hartford desired the substitution because Hartford became uneasy after Hartford was notified that Morchem was in default on the performance bond. The insurance provided by the Federal Deposit Insurance Company ("FDIC") for a single deposit is limited to the amount of $100,000. Hartford apparently sought to have provided to it total FDIC insurance coverage by causing the substitution of the six CDs for one single CD and by having each $82,000 CD considered separately.

On May 21, 1987, the Comptroller of the Currency declared TIB insolvent and the FDIC on that date took over TIB in the FDIC's capacity as receiver ("FDIC-R"). On or about May 22, 1987, River Oaks Bank notified Plaintiffs that it was in receipt of the insured deposits of TIB and welcomed Plaintiffs as new bank customers. On June 24, 1987, the FDIC, in its corporate capacity ("FDIC-C"),[1]

---

[1]"In its capacity as receiver, the FDIC is obligated to marshall the assets of the failed bank for the benefit of the bank's creditors and shareholders. In its corporate capacity,

2

informed Hartford of its determination that the six CDs issued in Hartford's name were the property of Morchem and also that those CDs had to be aggregated for deposit insurance purposes. Accordingly, the FDIC concluded that $392,000 of the $492,000 represented by the CDs was uninsured and that only $100,000 was insured. The FDIC-C paid that insured portion of the CDs, ie., $100,000, to River Oaks Bank, the institution which had acquired the deposits of TIB from the FDIC-R. On July 24, 1987, the FDIC-R retrieved the $100,000 from River Oaks Bank, and on July 29, 1987, offset the entire $492,000 represented by the six CDs against the debt Finultra owed TIB.[2]

On June 24, 1991, Plaintiffs filed suit in the district court against the FDIC as defendant in both its receivership and corporate capacities, seeking to recover $492,000 in deposit insurance for the six CDs or in the amount of the value of the CDs. On May 11, 1993, the district court severed all of plaintiffs'

_____

the FDIC is obligated to insure the failed bank's deposits." *FDIC v. Hatmaker,* 756 F.2d 34, 36 n. 2 (6th Cir.1985).

[2]Although not alluded to by either party in their filings before this Court, several documents filed in the district court reveal that on or about September 25, 1984, the bond issued by Hartford became the subject of one or more claims in Hartford's bond claim department. Subsequently, Hartford and Morchem became defendants in three lawsuits concerning the performance of Morchem's contract with Peoples Gas Systems Inc. On September 9, 1991, after years of protracted litigation, Hartford entered into a settlement agreement with Peoples Gas System, Inc. and others, pursuant to which Hartford was released from all actions asserted against it and all obligations under the performance bond issued by it for Morchem. Hartford claimed in the court below that it suffered financial losses in connection with the bond in excess of $415,000. Interrogatories answered by Hartford and filed in the court below state that Hartford paid out two claims under the bond, totalling $139,000.

claims against the FDIC in its corporate capacity and transferred them to this Court. The district court reasoned that 12 U.S.C. § 1821(f)(4), one of the sections of Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which places claims for deposit insurance within the exclusive jurisdiction of the federal Courts of Appeals, applied retroactively to plaintiffs' claims, ie., claims arising out of a receivership which commenced before August 9, 1989, the effective date of FIRREA. Accordingly, the district court denied the FDIC-C's motion for summary judgment because that court held that it lacked jurisdiction as to the insurance claim, but retained jurisdiction over non-insurance claims alleged against the FDIC-R. During oral argument before this Court, counsel for both sides confirmed that all claims against the FDIC-R had been settled.

In this appeal, the issues arise whether this Court has jurisdiction over Hartford's appeal, whether Hartford's claim against the FDIC was timely filed, whether the FDIC-C acted arbitrarily and capriciously in determining that the CDs belonged to Hartford, and whether, under various equitable principles, the FDIC's offset of the six CDs against the debt owed to TIB by Finultra was wrongful.

## I. SUBJECT MATTER JURISDICTION

In *Nimon v. Resolution Trust Corp.,* 975 F.2d 240, 244 (5th Cir.1992), this Court determined that 12 U.S.C. § 1821(f)(4) places claims involving deposit insurance within the exclusive jurisdiction of the federal Courts of Appeals. That FIRREA

4

provision provides:

> Final determination made by the Corporation shall be reviewable in accordance with the chapter 7 of Title 5 by the United States Court of Appeals for the District of Columbia or the court of appeals for the Federal judicial circuit where the principal place of business of the depository institution is located.

In the court below, Hartford argued that § 1821(f)(4), which was enacted on August 9, 1989, did not apply retroactively to receiverships created before that date, and thus, does not apply to the FDIC's 1987 receivership of TIB. Rejecting that argument, the district court transferred all of Hartford's claims against the FDIC-C to this Court pursuant to 28 U.S.C. § 1631.[3] Hartford has, in its reply brief in this appeal, dropped its opposition to retroactive application of § 1821(f)(4) to this case. However, in order to clarify the basis for our subject matter jurisdiction, we address the question of whether 12 U.S.C. § 1821(f)(4) applies retroactively to this case and conclude that it does.

We have recently applied 12 U.S.C. § 1821(f)(4) to an insurance coverage dispute, relating to the Federal Savings and Loan Insurance Corporation, based on "deposits made prior to enactment of [FIRREA]," although we did so without elaborating upon

---

[3]That section provides as follows:

> Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

5

the retroactivity issue. *Pool v. RTC,* 13 F.3d 880, 880-81 (5th Cir.1994). The Supreme Court recently clarified the circumstances in which a new statute which itself does not explicitly state whether it applies to pending cases should be applied retroactively. *See Landgraf v. USI Film Products, et al.,* --- U.S. ----, 114 S.Ct. 1483, --- L.Ed.2d ---- (1994) (deciding whether certain provisions of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071 (1991), should be applied retroactively to pending cases).[4] In so doing, the Supreme Court endorsed "the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *Id.* at ----, 114 S.Ct. at 1504. That presumption is based on "the unfairness of imposing new burdens on persons after the fact." *Id.* at ----, 114 S.Ct. at 1506. However, the Supreme Court stated that regardless of the general presumption against statutory retroactivity, "in many situations, a court should "apply the law in effect at the time it renders its decision.' " *Id.* (citing *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016). Such situations generally involve procedural changes to

---

[4]Prior to the Supreme Court's ruling in *Landgraf,* there were two seemingly different presumptions concerning statutory retroactivity. *Compare Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471-72, 102 L.Ed.2d 493 (1988) ("[C]ongressional enactments ... will not be construed to have retroactive effect unless their language requires this result.") *with Bradley v. School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."). The opinion in *Landgraf* was issued after oral argument was heard in the instant case.

existing law, including statutes which merely alter jurisdiction. "We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Id.* --- U.S. at ----, 114 S.Ct. at 1501. In such a circumstance, "[a]pplication of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case.' " *Id.* (quoting *Hallowell v. Commons,* 239 U.S. 506, 508, 36 S.Ct. 202, 202, 60 L.Ed. 409 (1916)).

This Court has previously recognized that principle, holding that amendments to statutes which affect procedural or remedial rights generally apply to pending cases, where such change does not deprive a party of its " "day in court.' " *NCNB Texas Nat'l Bank v. P & R Invs. No. 6,* 962 F.2d 518, 519 (5th Cir.1992) (quoting *FDIC v. 232, Inc.,* 920 F.2d 815, 818-19 (11th Cir.1991)). "When Congress adopts statutory changes while a suit is pending, the effect of which is not to eliminate a substantive right but rather to "change the tribunal which will hear the case,' those changes—barring specifically expressed intent to the contrary—will have immediate effect." *Turboff v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 867 F.2d 1518, 1521 (5th Cir.1989) (quoting *Hallowell,* 239 U.S. at 508, 36 S.Ct. at 202). Thus, we have retroactively applied 12 U.S.C. § 1819(b)(2),[5] permitting the FDIC

---

[5]That section currently provides in pertinent part:

    (A) In general

    Except as provided in subparagraph (D), all suits of a

to remove cases in which it is a party to federal court, to pending cases. *See, e.g., NCNB Texas Nat'l Bank,* 962 F.2d at 519; *In re Meyerland Co.,* 960 F.2d 512, 514 n. 2 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993); *Walker v. FDIC,* 970 F.2d 114, 120 (5th Cir.1992); *FSLIC v. Griffin,* 935 F.2d 691, 695-96 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *Triland Holdings & Co. v. Sunbelt Service Corp.,* 884 F.2d 205 (5th Cir.1989); *see also FDIC v. Belli,* 981 F.2d 838, 842-43 (5th Cir.1993) (applying 12 U.S.C. § 1821(d)(14),[6] extending the statute of limitations for contractual

civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States.

(B) Removal

Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any such action, suit, or proceeding from a state court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.

[6]That section provides in pertinent part:

(14) Statute of limitations for actions brought by conservator or receiver

(A) In general

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6-year period beginning on the date the claim accrues; or

claims held by the FDIC, retroactively to pending cases, except where so to do would revive an expired claim).  Section 1821(f)(4) changes the forum which hears deposit insurance disputes;  it does not alter any substantive rights of the parties nor does it deprive any party of its day in court.  Thus, we hold that 28 U.S.C. § 1821(f)(4) applies retroactively to govern this case and that this Court has jurisdiction in this appeal.

## II. LIMITATIONS

The FDIC argues that Hartford did not timely petition for review of the FDIC's deposit insurance determination.  In so doing, the FDIC relies on 12 U.S.C. § 1821(f)(5), which states:  "Any request for review of a final determination by the Corporation shall be filed with the appropriate circuit court of appeals not later than 60 days after such determination is ordered."  The FDIC argues that the 60-day time limit began to run in this case on the effective date of FIRREA, August 9, 1989.  Because Hartford did not file this suit until June 24, 1991, the FDIC contends that such filing is untimely.  Further, the FDIC asserts that applying §

---

(II) the period applicable under State law

....

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of the Corporation as conservator or receiver;  or

(ii) the date on which the cause of action accrues.

1821(f)(5) to Hartford retroactively is mandated under the aforementioned Fifth Circuit caselaw which generally permits procedural statutory amendments to be applied to pending cases. We do not agree with either of those two positions.[7]

The FDIC's assertion that retroactive application of § 1821(f)(5) is in accord with this Court's prior caselaw fails to

---

[7]In the court below, the FDIC-C argued that 12 U.S.C. § 1822(e) (1982) served as a statute of limitations barring plaintiff's suit. That provision states:

> *Unclaimed Deposits*
>
> If, after the Corporation shall have given at least three months' notice to the depositor by mailing a copy thereof to his last-known address appearing on the records of the closed bank, any depositor in the closed bank shall fail to claim his insured deposit from the Corporation within eighteen months after the appointment of the receiver for the closed bank, or shall fail within such period to claim or arrange to continue the transferred deposit with the new bank or with the other insured bank which assumes liability therefor, all rights of the depositor against the Corporation with respect to the insured deposit, and against the new bank and such other insured bank with respect to the transferred deposit, shall be barred, and all rights of the depositor against the closed bank and its shareholders, or the receivership estate to which the Corporation may have become subrogated, shall thereupon revert to the depositor. The amount of any transferred deposits not claimed within such eighteen months' period, shall be refunded to the Corporation.

The FDIC-C abandoned that argument before this Court. That abandonment would appear correct. A revised, but similar section, still governs disposition of unclaimed deposits. 12 U.S.C.A. § 1822(e) (West Supp.1994). The co-existence of § 1822(e) and § 1821(f)(5) under current law indicates that § 1822(e) was not meant to govern the within situation, ie., a dispute over insurance coverage where the FDIC-C is asserting that Hartford is *not* the actual depositor and where the FDIC-C did not inform Hartford that it must claim its deposits, but rather informed Hartford that it owned no insured deposits at all.

recognize that in the cases cited above, we approved retroactive application of procedural statutory changes where those changes did not deprive a litigant of its day in court, but rather changed the forum in which the claim was to be heard or extended a statute of limitations. In such instances, the substantive rights of the parties were not affected.[8] In contrast, retroactive application of § 1821(f)(5) in this case would extinguish claims which were valid before the statute's effective date and deprive Hartford of a forum, even though it acted properly under law existing at the time its claims arose. "[T]he mere fact that a new rule is procedural does not mean that it applies to every pending case." *Landgraf,* --- U.S. at ----, 114 S.Ct. at 1502 n. 29.

The FDIC recognizes that applying the 60-day limitations period from the date of the final determination is patently unfair because there is simply no way Hartford could have foreseen, on June 24, 1987, that a 60-day limitation would someday come into effect. Thus, the FDIC proposes that we begin running the limitations period from the date of FIRREA's enactment. While such an approach may not be unconstitutional, *see Fust v. Arnar-Stone*

---

[8]In *Belli,* we stated that we would not revive a stale claim even where a statute of limitations had been extended. The situation presented by this case is the flip side of that principle, ie., we will not "kill" a viable claim where the applicable statute of limitations is shortened. Contrary to the government's assertion, there is a difference between applying an extended statute of limitations where no substantive rights are affected and applying a shortened statute of limitations where so to do wipes out a substantive right.

*Laboratories, Inc.,* 736 F.2d 1098 (5th Cir.1984),[9] it would be manifestly unjust, and therefore in contravention of *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), because it would "infringe upon or deprive a person of a right that had matured," and would impose "unanticipated obligations ... upon a party without notice or an opportunity to be heard." *Id.* at 720, 94 S.Ct. at 2021. *See also Landgraf,* --- U.S. at ----, 114 S.Ct. at 1497 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). In this case, the FDIC's proposed limitations period would deprive Hartford of a forum without giving Hartford adequate notice to protect its otherwise valid rights. In hindsight, it may appear that Hartford should have moved quickly upon enactment of FIRREA and the inclusion in it of the 60-day limitations period. However, such hindsight fails to take into account the situation which reigned in retroactivity law prior to the Supreme Court's ruling in *Landgraf.* Further, given this Court's approval of retroactively applying procedural, as opposed to substantive, statutory changes, and the substantive aspect of the statutory change in this case, Hartford could reasonably have believed that the 60-day limitations period did not apply to it.

---

[9] " "[A] newly-created statute of limitation or one which shortens existing periods of limitation will not violate the constitutional prohibition against divesting a vested right provided it allows a reasonable time for those affected by the act to assert their rights.' " *Id.* at 1100 (quoting *Lott v. Haley,* 370 So.2d 521, 524 (La.1979)).

Finally, we note that the date of the "final determination" in this case is in dispute. The FDIC states that its final determination was made in the June 24, 1987, letter to Hartford.[10] However, Hartford correctly notes that final determinations may occur *after* the FDIC's initial determination and *after* several written exchanges between the FDIC and the alleged depositor concerning ownership of the deposit. *See Kershaw,* 987 F.2d at 1208; *Nimon,* 975 F.2d at 244. In this case, the FDIC never responded to Hartford's inquiries and requests for further information, despite the FDIC's direction to Hartford to submit any questions to the FDIC. The FDIC seemingly desires to convert a determination into a "final" determination simply by ignoring the inquiries of alleged depositors. Hartford concedes that prior to its institution of the within case, there has been a "de facto" final determination by the FDIC, and we agree. Nonetheless, even if the 60-day limitation period had been in effect in 1987, it is not clear, under the facts of this case, whether the limitations period would have begun

---

[10]That letter stated, "In examining the bank records it has been determined that the [six] certificates belong to Morchem Resources" After listing the six CD numbers and each CD's value at $82,000, the FDIC stated:

> In February 1987, the six (6) referenced documents were transferred into the name of six different Hartford companies. However, the six certificates continue to secure a loan in the name of Finultra, A.G. which is associated with Morchem Resources, Inc. Therefore, determination has been made to aggregate these deposits and an uninsured excess deposit exists for $392,000. *Should there be any questions, please contact the undersigned.*

(Emphasis added.)

running on June 24, 1987, the date of the letter from the FDIC to Hartford or on a later date.  In any event, for the reasons set forth *supra,* we decline to apply the 60-day limitations period retroactively to govern Hartford's claims.

At the time of the alleged final determination in this case, there was no federal statute or regulation specifically governing the limitations period for insurance coverage disputes.  As to general limitations provisions, Hartford's within filing was timely under either the general federal six year statute of limitations contained in 28 U.S.C. § 2401,[11] or Texas' four year statute of limitations contained in Tex.Civ.Prac. & Rem.Code §§ 16.004(c), 16.051.[12]  The FDIC does not dispute the applicability of one or both of those limitations periods.  Because Hartford filed timely

---

[11]That section provides in pertinent part:

> [E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

[12]Section 16.004(c) states:

> A person must bring suit against his partner for a settlement of partnership accounts, and must bring an action on an open or stated account, or on a mutual and current account concerning the trade of merchandise between merchants or their agents or factors, not later than four years after the day that the cause of action accrues.  For purposes of this subsection, the cause of action accrues on the day that the dealings in which the parties were interested together cease.

Section 16.051 states:

> Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues.

14

under each and all of those provisions, and because we conclude that § 1821(f)(5) does not bar Hartford's claims, we need not determine which of the federal or state limitations periods applies in pre-FIRREA insurance coverage dispute cases such as this one. Rather, we simply hold that Hartford's challenge to the FDIC's insurance determination is not time-barred.

### III. INSURANCE COVERAGE DISPUTE

We review insurance coverage determinations by the FDIC-C under the Administrative Procedure Act ("APA") and must affirm them unless they are " "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " *Kershaw v. RTC,* 987 F.2d 1206, 1208 (5th Cir.1993) (quoting *Nimon,* 975 F.2d at 244). Hartford, as the appellant, bears the burden of proving that the FDIC's determination was arbitrary and capricious. *Mississippi Hospital Ass'n v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983). In performing our duties of review under the APA, we accord deference to an administrative agency's interpretation of its own regulations. *Kershaw,* 987 F.2d 1206.

At the time the FDIC-C made the determination at issue in this case, the relevant pre-FIRREA statute defined "insured deposit" as "the net amount due to any depositor ... for deposits in an insured bank" up to $100,000. 12 U.S.C. § 1813(m)(1) (1982). That statute further provides: "[I]n determining the amount due to any depositor there shall be added together all deposits in the bank maintained in the same capacity and the same right for his

15

benefit either in his own name or in the names of others."[13]  *Id.*

Under the regulations issued by the FDIC "[f]or the purpose of clarifying and defining the insurance coverage under" the statute, *id.,* the FDIC determines the actual owner of a deposit account by examining the deposit account records.

> The deposit account records of the insured bank shall be conclusive as to the existence of any relationship pursuant to which the funds in the account are deposited and on which a claim for insurance coverage is founded.  Examples would be trustee, agent, custodian or executor.  No claim for insurance based on such a relationship will be recognized in the absence of such disclosure.

> Funds owned by a principal and deposited in one or more deposit accounts in the name or names of agents or nominees shall be added to any individual deposit accounts of the principal and insured up to $100,000 in the aggregate.

12 C.F.R. § 330.1(b);  330.2(b) (1987).

In this case, the FDIC-C determined that Morchem was the actual owner of the funds despite the fact that each of the six CDs bears the name of a different Hartford company.  The FDIC considered those Hartford companies as holding the funds represented by the CDs in some form of custodial or agency capacity.[14]  The FDIC relied primarily on the original Collateral

---

[13]We review insurance coverage determinations under the law in effect at the time the FDIC was appointed receiver.  *See Kershaw,* 987 F.2d at 1209 n. 1 (citing *Spawn v. Western Bank-Westheimer,* 925 F.2d 885, 887 n. 1 (5th Cir.1991)).  Accordingly, we apply the pre-FIRREA statutes and regulations in this part of the opinion.

[14]Because the FDIC-C's June 24, 1987, determination letter contained only a conclusory two-paragraph finding, we take the FDIC-C's explanations for certain of its actions from the briefs the FDIC has filed in this case.  In *Abrams v. FDIC,* the Second Circuit decided that a "cursory two-page letter" from the FDIC to an alleged depositor concluding that deposit accounts would not be insured was "wholly inadequate, and provides very little, if

Agreement, in which the single CD was pledged to secure the performance bond provided by Hartford. That agreement states that Morchem is the "Depositor," that Hartford, the "Surety," is only entitled to the collateral to the extent there is a loss on the bond, and that Hartford may foreclose on the bond to realize the value of the security. The FDIC determined further that no change in Morchem's status as the actual depositor occurred when the single CD was replaced with six CDs. That substitution agreement confirmed that the CDs were to be "held by the named Companies as security for the performance of the undertakings in the ... Collateral Agreement" and "shall be deemed the collateral substituted for the" single $492,000 CD.[15] Under a standard surety

---

any, basis upon which to conduct a meaningful review [of] the agency's determination." 938 F.2d 22, 25 (2nd Cir.1991). The Second Circuit remanded the case back to the FDIC for a fully written explanation of its actions. This case also unfortunately presents the problem of a "perfunctory analysis" by the FDIC. *Id.* However, because any remand would likely only result in the same explanation that the FDIC has proffered in the district court and in this court, we will accept the FDIC's explanations as presented in its brief.

[15]The FDIC's determination is in accord with the general common law principles governing ownership of collateral.

> Ordinarily the general property or title in the thing pledged remains in the pledgor, subject to a lien in favor of the pledgee for the amount of the debt or obligation for which the pledge is given. This rule applies notwithstanding an apparent transfer of legal title to the pledgee. This general property or title in the pledgor continues until there has been a sale or foreclosure under the contract of pledge.

> Ordinarily, a pledgee of personal property does not acquire the legal title thereto.... As a general rule, sometimes affirmed by statute, the pledgee has merely a special property or interest in the thing pledged during the continuance of the pledge, which

agreement such as this one, a surety such as Hartford gains rights to foreclose upon pledged collateral only if the obligor defaults on the bond and the surety correspondingly suffers a loss. In such a situation, the surety could have a claim to the FDIC's insurance coverage of the CDs through its rights with respect to those CDs as collateral. However, while the record does indicate that Hartford has paid claims under the bond, Hartford, in this appeal, has not relied on such loss.[16] Rather, in this appeal, Hartford has emphasized that it owns the CDs because its name is on them.[17]

---

> vests in the pledgee the right to the property as far as is necessary to secure payment of the debt. In any event, the pledgee acquires only such interest as to allow him security for his debt or obligation.

72 C.J.S. Pledges § 21 (footnotes omitted). *See also Congress Talcott Corp. v. Gruber,* 993 F.2d 315, 319-20 (3rd Cir.1993); *Major Appliance Co. v. Gibson Refrigerator Sales Corp.,* 254 F.2d 497, 502 (5th Cir.1958).

[16]Even if Hartford desired to emphasize, in this appeal, the payment of such claims, the latter would appear to relate to issues involving the FDIC-R which are not before this Court and have been settled in the district court, *see infra,* and not to any issues concerning insurance coverage and the FDIC-C. The record in this case is hardly a model of clarity. Accordingly, there may be contentions which Hartford could make in this appeal respecting insurance which would aid it. But Hartford had ample opportunities to proffer facts to, and to make legal contentions before, this Court. Thus, Hartford has been afforded its full day in court, regardless of whether or not there was any lack of appropriate procedure at the administrative level before the FDIC-R.

[17]Hartford claims that on the same day the Collateral Agreement was signed, Morchem assigned the single $492,000 CD to Hartford, making Hartford the owner of the CD. Hartford states that the assignment document was in the bank records, while the FDIC asserts the document was not in the records and that therefore the doctrine enunciated in *D'Oench Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), precludes this Court from considering the assignment. Hartford responds that the *D'Oench, Duhme* doctrine is limited to agreements to which the

18

The FDIC-C, before making the determination of ownership, apparently did not discover that there were in fact defaults by Morchem;  however, such failure by the FDIC-C does not add up to arbitrary or capricious conduct on its part, given that nothing in the bank records indicates that such loss had occurred.  At the time of the agency's determination of ownership, there was no regulation defining "deposit account records."  In *Abdulla Fouad & Sons v. FDIC,* 898 F.2d 482, 486 (5th Cir.1990), we rejected appellant's claim that the FDIC should have examined records other than those contained in the deposit account records to determine depositor status.  We explained that the FDIC was not required to undertake such examinations because the FDIC was empowered and expected by Congress " "to make available to the public its insured savings as speedily as possible.' "  *Id.* at 485 (quoting Scott, Some Answers to Account Insurance Problems, *The Business Lawyer* 493, 504 (Jan.1968)).  Because the FDIC "must literally make determinations of deposit insurance coverage overnight," the FDIC is not called upon to use its limited resources to investigate possible ownership rights outside of those indicated in the deposit account records themselves.  *Id.*  Thus, the FDIC did not need to go beyond the bank file concerning the CDs to determine who had

---

bank is a party, unlike the assignment at issue in this case, to which the vice president of the bank was merely a witness.  We find it unnecessary to resolve the factual dispute, concerning whether the assignment document was in the bank records, or to reach the *D'Oench, Duhme* coverage issue, because we conclude that all parts of the record in this case, including the assignment document, support the FDIC's determination that the CDs were posted as collateral.

ownership interests in the CDs.

Nor in this case did the FDIC look at too many records before making its determination as to ownership. Hartford claims that the only records relating to the "deposit account" are the CDs themselves and TIB's computer listing of open customer accounts. But, even if some of those documents related to matters other than "deposit accounts," they clearly related to ownership of the CDs since they pertain to the question of who had a right with respect to those CDs and under what circumstances.[18] Thus, the FDIC did not act arbitrarily or capriciously in determining that Morchem owned the CDs and that the CDs should be aggregated.

## IV. OFFSET CLAIMS

Hartford argues that the FDIC's offset of the six CDs against the debt owed TIB by Finultra was wrongful and asks this Court to impose a constructive trust or to grant some similar type of equitable relief. However, Hartford's equitable claims are based on actions taken by the FDIC-R, not the FDIC-C.[19] Since the FDIC-

---

[18]Hartford's interpretation of deposit records would unduly limit the FDIC to the most superficial evaluation in this type of case. For instance, the computer records on which Hartford would have the FDIC rely are printouts of the names of accountholders, which list only "short names" and have no space to disclose trust or surety arrangements. Similarly, the CDs themselves state that interest is to be awarded to the Hartford companies, while the other documents, as well as actual practice, reveal that Morchem received all interest on the CDs.

[19]Hartford concedes that its equitable claims all arise out of the FDIC's admittedly wrongful offset and that the equitable claims do not involve the insurance coverage dispute. However, Hartford claims that it does not know which "hat" the FDIC was wearing when it made the wrongful offset. But before the district court, Hartford in its own proposed pre-trial order, stated that "[o]n July 24, 1987, *FDIC-R* retrieved the $100,000

20

R has been dismissed in this case pursuant to a settlement agreement in the district court, and because this appeal relates only to Hartford's insurance claims, the offset claims are not open. Under the dual capacities doctrine, the FDIC-C may not be held liable for acts committed by the FDIC-R, ie., the FDIC acting in one capacity is not subject to defenses or claims based on its acts in other capacities. *See Texas American Bancshares, Inc. v. Clarke,* 954 F.2d 329, 335 (5th Cir.1992).

For the reasons set forth in this opinion, Hartford's petition for review is DENIED.

---

from River Oaks Bank, and on July 28, 1987, setoff the entire $492,000 represented by the six CDs against debt owed by Finultra, A.G." (Emphasis added.) From the inception of this case, the parties have proceeded under the understanding that the FDIC was being sued in both capacities, that the FDIC-C was responsible for the insurance coverage, and that the FDIC-R was responsible for other matters including offset. Hartford points to no evidence that the FDIC-C had a hand in the offset. Rather, exhibit documents from the FDIC's file concerning the offset are from the FDIC's liquidation office, revealing that the FDIC was acting in its receivership capacity, because only the FDIC-R has the statutory authority to "place the insured depository institution in liquidation." 12 U.S.C. § 1821(d)(2)(E).