# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 3, 2017

Lyle W. Cayce
Clerk

—————

No. 15-20225

—————

RAMCHANDRA ADHIKARI; DEVAKA ADHIKARI; JIT BAHDUR
KHADKA; RADHIKA KHADKA; BINDESHORE SINGH KOIRI; PUKARI
DEVI KOIRI; CHITTIJ LIMBU; KAMALA THAPA MAGAR; MAYA THAPA
MAGAR; BHAKTI MAYA THAPA MAGAR; TARA SHRESTHA; NISCHAL
SHRESTHA; DIL BAHADUR SHRESTHA; GANGA MAYA SHRESTHA;
SATYA NARAYAN SHAH; RAM NARYAN THAKUR; SAMUNDRI DEVI
THAKUR; JITINI DEVI THAKUR; BHIM BAHADUR THAPA; BISHNU
MAYA THAPA; BHUJI THAPA; KUL PRASAD THAPA; BUDDI PRASAD
GURUNG,

            Plaintiffs–Appellants,

v.

KELLOGG BROWN & ROOT, INCORPORATED; KELLOGG BROWN &
ROOT SERVICES, INCORPORATED; KBR, INCORPORATED; KBR
HOLDINGS, L.L.C.; KELLOGG BROWN & ROOT L.L.C.; KBR TECHNICAL
SERVICES, INCORPORATED; KELLOGG BROWN & ROOT
INTERNATIONAL, INCORPORATED; SERVICE EMPLOYEES
INTERNATIONAL, INCORPORATED; OVERSEAS EMPLOYMENT
ADMINISTRATION; OVERSEAS ADMINISTRATION SERVICES,

            Defendants–Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————

Before HIGGINBOTHAM, PRADO, and GRAVES, Circuit Judges.

1

No. 15-20225

EDWARD C. PRADO, Circuit Judge:

In 2004, an Iraqi insurgent group kidnapped and murdered twelve Nepali men as they traveled through Iraq to a United States military base to work for Daoud & Partners ("Daoud"), a Jordanian corporation that had a subcontract with Defendant–Appellee Kellogg Brown Root ("KBR").[1] In 2008, the victims' families, and one Daoud employee who was not captured (collectively "Plaintiffs"), sued Daoud and KBR. Plaintiffs alleged that the companies "willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits," and thereby engaged in human trafficking. Plaintiffs brought causes of action under the Alien Tort Statute ("ATS"), the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and state common law. Although Plaintiffs settled with Daoud, they have continued their lawsuit against KBR. The district court, after nearly six years of motion practice and discovery, eventually dismissed all of Plaintiffs' claims.

We hold that the district court's grant of summary judgment on the ATS claims in favor of KBR was proper in light of the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), which held that the ATS did not apply extraterritorially. We also conclude that the district court correctly dismissed the TVPRA claims because (1) the TVPRA did not apply extraterritorially at the time of the alleged conduct in 2004 and (2) applying a 2008 amendment to the TVPRA that had the effect of permitting Plaintiffs' extraterritorial claims would have an improper retroactive effect on KBR. Lastly, we hold that the district court did not abuse its discretion in dismissing the common law claims by refusing to equitably toll Plaintiffs' state law tort claims. Accordingly, we AFFIRM.

---

[1] KBR refers to several related corporate entities—all named as Defendants in this case.

No. 15-20225

# I. BACKGROUND

## A.   Factual Background

Plaintiffs–Appellants in this case are Buddi Gurung ("Plaintiff Gurung") and surviving family members of eleven deceased men (collectively, the "Deceased"). All Plaintiffs are citizens of Nepal.

In or around 2004, the Deceased were recruited to work by a Nepal-based recruiting company. As the district court found, "each man was promised a hotel related job in Jordan" and "each man's family took on significant debt in order to pay recruitment fees." The Deceased travelled from Nepal to Jordan where they were housed by a Jordanian job-brokerage company, Morning Star for Recruitment and Manpower Supply ("Morning Star"). Morning Star transferred the Deceased to Daoud. Daoud had a subcontract with KBR, a U.S. military contractor, to provide staff to operate the Al Asad Air Base ("Al Asad"), a U.S. military base north of Ramadi, Iraq.

While in Jordan, the Deceased "were subject to threats and harm," "their passports were confiscated," and they were "locked into a compound and threatened." The Deceased were also told for the first time that they were actually being sent to Iraq to work on Al Asad and would be paid only three-quarters of what they were initially promised.

In August 2004, Daoud transported the Deceased into Iraq in an unprotected automobile caravan. The Deceased, however, never made it to the base. While traveling through Iraq, they were captured by Iraqi insurgents. The insurgents posted online videos of the Deceased in which the Deceased said that they had been "trapped and deceived and sent to Jordan" and had been "forced . . . to go to Iraq." Horrifically, the Iraqi insurgents executed the Deceased, and a video of the executions was broadcast by international media outlets,

No. 15-20225

Plaintiff Gurung travelled in the same automobile caravan as the Deceased. He also had been recruited to work in Nepal and had travelled to Jordan, but the car he was in was not captured and he arrived at Al Asad. Plaintiff Gurung worked on the base as a "warehouse loader/unloader" for approximately fifteen months. Plaintiff Gurung alleged that Daoud and KBR told him that "he could not leave until his work in Iraq was complete."

## B.    Procedural Background

In 2008, Plaintiffs filed suit against KBR and Daoud. They asserted claims under the TVPRA and the ATS, and also brought common law negligence claims.[2] In November 2009, the district court granted KBR's motion to dismiss Plaintiffs' common law negligence claims. It held that these claims were barred by the statute of limitations and denied Plaintiffs' request for equitable tolling. However, the court denied KBR's motion as to Plaintiffs' TVPRA and ATS claims.

In August 2013, the district court granted in part and denied in part KBR's motion for summary judgment. It dismissed Plaintiffs' ATS claims against KBR in light of the Supreme Court's intervening decision in *Kiobel*. In *Kiobel*, the Supreme Court held that the presumption against extraterritoriality applies to ATS claims and nothing in the statute rebuts the presumption. 133 S. Ct. at 1669. The district court held that *Kiobel* compelled dismissal of the ATS claims because "all relevant conduct by Daoud and KBR occurred outside of the United States." The court denied KBR's motion for summary judgment on the TVPRA claim, noting that the law was "expressly extraterritorial" under 18 U.S.C. § 1596.

---

[2] Plaintiffs also asserted claims under the Racketeer Influenced and Corrupt Organization statute ("RICO"), which the district court dismissed. Because Plaintiffs do not challenge the dismissal of these claims, they are not at issue on appeal.

No. 15-20225

KBR moved for interlocutory review of the district court's TVPRA ruling under 28 U.S.C. § 1292(b). In response, the district court reconsidered its denial of summary judgment sua sponte on the TVPRA claim. The court reversed its previous decisions and held that the TVPRA—like the ATS—did not apply extraterritorially at the time of the alleged conduct in 2004. It explained that although Congress passed an amendment in 2008 that provided federal courts with jurisdiction over purely extraterritorial TVPRA civil claims, *see* Pub. L. No. 110-457, § 223(a), 122 Stat. 5044 (2008) (codified at 18 U.S.C. § 1596(a)), this amendment had the effect of altering the parties' substantive rights and, as a result, could not be applied retroactively to KBR's alleged 2004 conduct.

Plaintiffs responded by filing motions for rehearing on the district court's TVPRA and ATS rulings and for leave to amend their ATS claims. In March 2015, the district court denied these motions. This appeal followed.

## II. DISCUSSION

Plaintiffs argue that we should allow their ATS, TVPRA, and common law tort claims to proceed. We address each claim in turn.

### A.     The ATS Claims

The district court dismissed the ATS claims at summary judgment. We review a grant of summary judgment de novo. *RTM Media, LLC v. City of Houston*, 584 F.3d 220, 223 (5th Cir. 2009). "Summary judgment is proper when the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Chacko v. Sabre, Inc.*, 473 F.3d 604, 609 (5th Cir. 2006)).

"The ATS provides, in full, that '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.'" *Kiobel*, 133 S. Ct. at 1663 (quoting 28 U.S.C. § 1350). Although the statute "provides district courts

with jurisdiction to hear certain claims," it "does not expressly provide any causes of action." *Id.* Rather, the ATS provides jurisdiction for a "modest number of international law violations" that are derived from federal common law. *Id.* (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004)). To be cognizable, a plaintiff's claims must be stated "with the requisite definite content and acceptance among civilized nations." *Doe v. Drummond Co.*, 782 F.3d 576, 583 (11th Cir. 2015) (quoting *Kiobel*, 133 S. Ct. at 1663), *cert. denied*, 136 S. Ct. 1168 (2016).

Plaintiffs contend that KBR's alleged involvement in the trafficking of the Deceased and Plaintiff Gurung and in the forced labor of Plaintiff Gurung at Al Asad constitute actionable torts under the ATS. KBR counters that Plaintiffs' allegations of misconduct in foreign countries are barred by the presumption against extraterritoriality.

### 1. The Presumption Against Extraterritoriality

The presumption against extraterritoriality is a canon of statutory interpretation rooted in the "longstanding principle" that a federal statute "is meant to apply only within the territorial jurisdiction of the United States" absent congressional intent to the contrary. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

A two-step inquiry governs the presumption's application to a statute. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). First, "we ask whether the presumption against extraterritoriality has been rebutted— that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* Second, "[i]f the statute is not extraterritorial, then . . . we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.'" *Id.*

No. 15-20225

Step two's "focus" inquiry is derived from the Supreme Court's decision in *Morrison*. *See* 561 U.S. at 255. As the Supreme Court explained, whether the presumption bars a claim is not always "self-evidently dispositive" because cases will often have some "contact with the territory of the United States." *Id.* at 266. In *Morrison*, the plaintiffs had brought suit under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") based on alleged misrepresentations made in connection with the sales and purchases of securities registered on foreign exchanges. *Id.* at 250–53. Some of these misrepresentations occurred in the United States. *Id.* After holding the presumption against extraterritoriality applied to § 10(b), *id.* at 265, the Court "engaged in a separate inquiry to determine whether the complaint . . . involved a permissible *domestic* application of § 10(b) because it alleged that some of the relevant misrepresentations were made in the United States." *RJR Nabisco*, 136 S. Ct. at 2100. The Court's separate inquiry considered the statute's "focus." *Id.*; *Morrison*, 561 U.S. at 266. The Court ruled that the Exchange Act's "focus" was "not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 561 U.S. at 266. It concluded that because the statute was focused on domestic securities transactions, the plaintiffs' alleged domestic activity—the misrepresentations—made in connection with a foreign transaction failed to show a permissible domestic application of the statute. *See id.* at 267; *RJR Nabisco*, 136 S. Ct. at 2100.

As for the ATS, the Supreme Court in *Kiobel* addressed step one of the extraterritoriality inquiry: the Court held that the "presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." 133 S. Ct. at 1669. In that case, Nigerian nationals sued Dutch, British, and Nigerian corporations, alleging that they aided and abetted the Nigerian military in committing international law

violations in Nigeria. *Id.* at 1662. The Court held that the ATS did not confer jurisdiction because "all the relevant conduct took place outside the United States."[3] *Id.* at 1669. Although the Court found that the presumption precluded the plaintiffs' claims "[o]n these facts," it did not foreclose the possibility that there may be circumstances in which the bar would not apply. *Id.* The Court stated that the ATS could create jurisdiction for "claims [that] touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.* (citing *Morrison*, 561 U.S. at 265–73). Notably, in discussing claims that "touch and concern" the United States, the Court cited to *Morrison* and its "focus" inquiry. *See Kiobel*, 133 S. Ct. at 1669 (citing *Morrison*, 561 U.S. at 265–73).

On appeal, the parties dispute the meaning of *Kiobel*'s "touch and concern" language, including how to reconcile it with *Morrison*'s "focus" inquiry. Plaintiffs, along with amici curiae, suggest that *Kiobel* provided an ATS-specific test that largely supplants *Morrison*'s "focus" analysis. In support, Plaintiffs point to the Fourth Circuit's decision in *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014), one of the first decisions to analyze *Kiobel*'s "touch and concern" language. In *Al Shimari*, the court observed that "the 'claims,' rather than the alleged tortious conduct, must touch and concern United States territory with sufficient force, suggesting that courts must consider all the facts that give rise to ATS claims, including the

---

[3] The plaintiffs in *Kiobel* alleged that after residents of Ogoniland, Nigeria, began to protest the defendants' oil exploration in that area, the defendants "enlisted the Nigerian Government to violently suppress [these] burgeoning demonstrations." 133 S. Ct. at 1662. The plaintiffs further alleged that the defendants "aided and abetted" the Nigerian military and police forces in committing atrocities against the Ogoni residents, including by providing the "Nigerian forces with food, transportation, and compensation." *Id.* at 1663. The defendants' only identified contact with the United States was that their shares were listed on the New York Stock Exchange and an affiliated company had an office in New York City. *Id.* at 1677 (Breyer, J., concurring).

parties' identities and their relationship to the causes of action." *Id.* at 527 (quoting *Kiobel*, 133 S. Ct. at 1669). Plaintiffs contend that *Kiobel* mandates a fact-specific analysis that looks to "the totality of [their] claim's connection to U.S. territory and the national interest."

KBR responds that *RJR Nabisco* makes clear that *Morrison*'s "focus" test still governs. We agree. In *RJR Nabisco*, the Supreme Court observed that both "*Morrison* and *Kiobel* reflect a two-step framework for analyzing extraterritoriality issues." 136 S. Ct. at 2101. As the Court clarified, *Kiobel* did not reach step two—i.e., the Court "did not need to determine, as [it] did in *Morrison*, the statute's 'focus'"—because "'all the relevant conduct' regarding" the alleged international-law violations occurred overseas. *Id.* (quoting *Kiobel*, 133 S. Ct. at 1670). In other words, the Court in *Kiobel* did not disclaim the focus inquiry for ATS claims. It simply pretermitted the issue. *See Balintulo v. Daimler AG*, 727 F.3d 174, 191 (2d Cir. 2013) ("[S]ince *all* the relevant conduct in *Kiobel* occurred outside the United States—a dispositive fact in light of the Supreme Court's holding—the Court had no reason to explore, much less explain, how courts should proceed when some of the relevant conduct occurs in the United States.").

Therefore, if an ATS claim involves some domestic activity relevant to the claim, "further analysis" is required. *Morrison*, 561 U.S. at 266; *accord RJR Nabisco*, 136 S. Ct. at 2100. This analysis—step two of the extraterritoriality inquiry—requires looking to the ATS's focus, which resolves whether the claims "touch and concern" the United States territory with "sufficient force" such that the presumption against extraterritoriality is displaced. *Kiobel*, 133 S. Ct. at 1669; *see also Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014) ("An evaluation of the presumption's application to a particular case is essentially an inquiry into whether the domestic contacts are sufficient to avoid triggering the presumption at all.").

No. 15-20225

Step two, however, requires distinguishing between conduct underlying the plaintiff's claim—i.e., cause of action—from conduct relevant to the statute's focus. Only conduct relevant to the statute's focus determines domestic application of the statute. *See Morrison*, 561 U.S. at 266. Thus, for ATS claims, "[i]f the conduct relevant to the [ATS's] focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101. But "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

We note that other circuits have offered differing interpretations of *Kiobel*'s "touch and concern" language, including to what extent it adopts *Morrison*'s "focus" inquiry. The Ninth Circuit has explicitly held that *Kiobel* "did not incorporate *Morrison*'s focus test," *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014), although the eight judges that dissented from denial of rehearing en banc disagreed, *see Doe I v. Nestle USA, Inc.*, 788 F.3d 946, 953 (9th Cir. 2015) (Bea, J., dissenting). By contrast, the Second Circuit has held that *Morrison* controlled its ATS analysis by requiring courts to evaluate "the 'territorial event[s]' or 'relationship[s]' that were the 'focus' of the ATS." *Mastafa*, 770 F.3d at 184 (quoting *Morrison*, 561 U.S. at 266). The Eleventh Circuit has adopted a hybrid approach: it "amalgamate[d] *Kiobel*'s standards with *Morrison*'s focus test, considering whether 'the claim' and 'relevant conduct' are sufficiently 'focused' in the United States to warrant displacement and permit jurisdiction." *Doe v. Drummond*, 782 F.3d at 590 (quoting *Baloco v. Drummond Co.*, 767 F.3d 1229, 1238–39 (11th Cir. 2014)), *cert. denied*, 136 S. Ct. 1168 (2016).

We have not yet entered the jurisprudential fray surrounding *Kiobel*. Nevertheless, we conclude that the Supreme Court's guidance in *RJR*

10

No. 15-20225

*Nabisco*—which was issued after the foregoing circuit court opinions—is determinative and, in turn, apply *RJR Nabisco*'s two-step framework. *See* 136 S. Ct. at 2101. As explained further below, our approach largely comports with the Second Circuit's "ATS 'focus' analysis" to the extent it involves "examining the conduct alleged to constitute violations of the law of nations, and the location of that conduct." *Mastafa*, 770 F.3d at 185.

### 2. *Application of the Two-Step Framework*

We turn to applying the two-step framework where, as here, the ATS claims involve extraterritorial conduct. *Kiobel* answered step one: the ATS does not apply extraterritorially. Thus, under step two, we must determine whether Plaintiffs have sought a domestic application of the statute. We first look to whether there is any domestic conduct relevant to Plaintiffs' claims under the ATS. If we conclude that the record is devoid of any domestic activity relevant to Plaintiffs' claims, our analysis is complete: as in *Kiobel*, the presumption against extraterritoriality bars the action. *See Kiobel*, 133 S. Ct. at 1669; *RJR Nabisco*, 136 S. Ct. at 2101.

Plaintiffs allege that KBR violated international law by engaging in a scheme to traffic Plaintiffs and to subject them to forced labor on Al Asad. As for the claim regarding the Deceased, the recruitment, transportation, and alleged detention by Daoud and Morning Star all occurred in Nepal, Jordan, and Iraq. The Deceased never arrived at Al Asad. Thus, none of this overseas conduct relevant to their trafficking claim—even assuming without deciding that it can be imputed to KBR—could support the conclusion that Plaintiffs seek to apply the ATS domestically.

Plaintiffs further contend that the district court had jurisdiction under the ATS in light of KBR's conduct (1) on Al Asad and (2) within the United States, which Plaintiffs argue is sufficient to displace the presumption against extraterritoriality.

11

### a.    *Al Asad*

Plaintiffs argue that Al Asad was under the jurisdiction and control of the United States and that, as a result, KBR's actions on the base constitute domestic conduct for purposes of their ATS claims. In particular, they claim that KBR's conduct on Al Asad was integral to Plaintiff Gurung's claim that he was subject to forced labor during the fifteen months he worked on the base. They also contend that KBR's conduct at Al Asad is relevant to the claim that the Deceased were victims of human trafficking. Notably, the district court found that Plaintiffs had presented a genuine dispute of material fact whether KBR "knowingly obtained trafficked labor during the relevant time period," although it concluded that evidence pointed only to KBR's Al Asad operations.

In deciding whether KBR's conduct on Al Asad constitutes domestic conduct, we first address how to distinguish between domestic and foreign conduct for purposes of the presumption against extraterritoriality.[4] KBR contends that the question is a matter of de jure sovereignty, arguing that "Iraq's retention of *de jure* sovereignty over Al Asad defeats characterizing it as U.S. territory." *See* Coalition Provisional Authority Order No. 17 (Revised) § 9 (noting that any premises operated by the Multinational Forces in Iraq "remain Iraqi territory"). KBR's assertion is not without support in recent Supreme Court case law. In *Kiobel,* the Court held that the issue was whether a claim under the ATS "may reach conduct occurring in the territory of a *foreign sovereign.*" 133 S. Ct. at 1664 (emphasis added). *RJR Nabisco* also suggests that domestic conduct is that which "occurred in the United States" rather than "in a foreign country." 136 S. Ct. at 2101. Nevertheless, the

---

[4] It is worth noting the scope of Plaintiffs' reasoning: it is not limited to the ATS. Plaintiffs' contention would compel the conclusion that federal laws generally applied to Al Asad in 2004.

Supreme Court in *Kiobel* and *RJR Nabisco* did not squarely address whether what constitutes the United States also encapsulates its de facto territory.

Plaintiffs counter by citing to the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466 (2004), which suggests a functional inquiry may be applicable. In *Rasul*, the Court addressed whether the federal habeas statute, 28 U.S.C. § 2241, applied to persons detained at the United States Naval Base at Guantanamo Bay, Cuba. *Id.* at 470–75. The Court explained that "[w]hatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no application to the operation of the habeas statute with respect to persons detained within 'the territorial jurisdiction' of the United States." *Id.* at 480 (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). In coming to this conclusion, the Court highlighted that the "United States exercise[d] 'complete jurisdiction and control' over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses." *Id.* (quoting Treaty Between the United States of America and Cuba, art. 3, May 29, 1934). However, the Court also noted its conclusion was supported by the Government's concession that the habeas statute "would create federal-court jurisdiction over the claims of an American citizen held at the base." *Id.* at 481.

At least one court has observed that *Rasul*'s holding is essentially limited to the habeas context. *See Marshall v. Exelis Sys. Corp.*, No. 13-CV-00545, 2014 WL 1213473, at *7 (D. Colo. Mar. 24, 2014).[5] Regardless, we need not resolve

---

[5] Plaintiffs also cite the Supreme Court's analysis in *Boumediene v. Bush*, 553 U.S. 723 (2008), which adopted a functional approach rather than a "formalistic sovereignty-based test for determining the reach of the Suspension Clause." *Id.* at 762. They argue that we should apply *Boumediene*'s analysis to decide whether Al Asad constituted United States territory for purposes of the presumption against extraterritoriality. KBR counters that *Boumediene* is inapposite because it was "driven by separation-of-powers concerns," namely the essential role the writ of habeas corpus has on constraining government authority. *See Boumediene*, 553 U.S. at 765–66. By contrast, the presumption against extraterritoriality—

to what extent *Rasul*'s reasoning extends beyond the habeas context for purposes of the presumption against extraterritoriality. Assuming *arguendo* that it applies here, Plaintiffs have failed to establish that the United States controlled Al Asad in 2004 such that it constituted the territory of the United States. As other courts have found, a U.S. military base does not constitute de facto territory where "the United States has not demonstrated intent to exercise sovereignty over" that base permanently. *Marshall*, 2014 WL 1213473, at *6; *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010) (rejecting "the notion that [the United States'] *de facto* sovereignty extends to" Bagram Airfield in Afghanistan where "there is no indication of any intent to occupy the base with permanence"). Here, in contrast with the Guantanamo Bay Naval Base—over which the United States had "unchallenged and indefinite control," *Rasul*, 542 U.S. at 487 (Kennedy, J., concurring)—the United States' use of Al Asad had only begun in 2003, one year before the conduct at issue. Further, it lasted until only 2011. On this record, we are unconvinced that Al Asad constituted de facto territory of the United States in 2004. Consequently, because KBR's actions at Al Asad occurred in Iraq and not the United States, those actions cannot constitute domestic conduct relevant to their ATS claims.

### b.      *U.S.-Based Conduct*

Plaintiffs also argue that U.S.-based conduct rebuts the presumption against extraterritoriality. First, they cite KBR's domestic payments to Daoud, the subcontractor that hired the Deceased and Plaintiff Gurung. Second, they

---

a canon of statutory interpretation—is only "a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison*, 561 U.S. at 255. We agree with KBR that *Boumediene*'s analysis does not apply. *See Marshall*, 2014 WL 1213473, at *7 ("*Boumediene* is not simply a rights-based decision which bestows rights and freedoms upon those at Guantánamo. Rather, it is a limitation on government power to act extra-judicially in a place that is functionally a territory of the United States."). Thus, we address Plaintiffs' claim based solely on *Rasul* because it explicitly addressed the presumption against extraterritoriality.

claim that employees based in Houston, Texas, were "aware of allegations of human trafficking at [KBR's] worksites."

Whether Plaintiffs seek a domestic application of the statute is determined by the location of the conduct relevant to the ATS's focus. *See RJR Nabisco*, 136 S. Ct. at 2101. Thus, we ask what the "'focus' of congressional concern" is with the ATS. *Morrison*, 561 U.S. at 266. We agree with the district court that the ATS's focus is the "tort . . . committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. That is, the focus is conduct that violates international law, which the ATS "seeks to 'regulate'" by giving federal courts jurisdiction over such claims. *Morrison*, 561 U.S. at 267. And if that conduct "occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 136 S. Ct. at 2101; *see also Mastafa*, 770 F.3d at 185 (noting that the "ATS 'focus' analysis" requires "examining the conduct alleged to constitute violations of the law of nations, and the location of that conduct"); *Doe v. Drummond*, 782 F.3d at 592 ("[O]ur jurisdictional inquiry requires us to consider the domestic or extraterritorial location where the defendant is alleged to engage in conduct that directly or secondarily results in violations of international law within the meaning of the ATS.").

Plaintiffs allege that KBR was directly liable for the tort of human trafficking and forced labor. However, all the conduct comprising the alleged international law violations occurred in a foreign country. As the district court explained, "Plaintiffs can no more pursue an ATS claim against KBR based on those extraterritorial actions than they can pursue an ATS claim against Daoud."

Plaintiffs have failed to show how KBR's alleged financial transactions permit a domestic application of the ATS. They contend that KBR "transferred payments to [Daoud] from the United States, using New York Banks."

However, they failed to connect the alleged international law violations to these payments or demonstrate how such payments—by themselves— demonstrate that KBR's U.S.-based employees actually engaged in trafficking the Deceased or forcing Plaintiff Gurung to work on its base. *See Mastafa*, 770 F.3d at 185 (citing *Balintulo*, 727 F.3d at 192 (holding that the plaintiffs' "allegations were insufficient to displace the presumption" against extraterritoriality where "defendants' alleged domestic conduct lacked a clear link to the human rights abuses occurring in South Africa that were at the heart of plaintiffs' action")).

Further, Plaintiffs' contention that KBR's U.S.-based employees may have known about "allegations" of human rights abuse by Daoud or KBR overseas is not enough to raise a genuine fact dispute that those employees were directly liable for violating international law. In response to Plaintiffs' motion for reconsideration of its ruling, the district court acknowledged that Plaintiffs had introduced some evidence suggesting KBR knew it obtained trafficked labor. However, it noted that such evidence only implicated KBR's operations overseas. Plaintiffs had failed to introduce any evidence indicating that KBR's U.S.-based employees either (1) "understood the circumstances surrounding Daoud's 'recruitment' and 'supply' of third-country nationals like Plaintiffs" or (2) "worked to prevent those circumstances from coming to light or Daoud's practices from being discontinued." Further, Plaintiffs effectively concede this point: in reference to the district court's reasoning that U.S.-based employees did not "cover up" human trafficking, they argue they "would have specifically alleged such conduct by U.S.-based KBR employees" had they been permitted to amend their complaint.

Lastly, we find Plaintiffs' alternative arguments unpersuasive. They note that the Supreme Court in *Kiobel* reasoned the presumption against extraterritoriality serves to protect against "international discord" that could

16

result if U.S. law governed overseas. *Kiobel*, 133 S. Ct. at 1661 (citing *Arabian Am. Oil Co.*, 499 U.S. at 248). Relying on this language, Plaintiffs argue that *Kiobel* established the inverse rule: the presumption does not apply in cases where entertaining the ATS claim would not "negatively impact[] U.S. foreign policy." They further contend that refusing to apply the presumption here would promote U.S. foreign policy because it would enable Plaintiffs to hold a military contractor such as KBR liable for conduct on a U.S. military base. Relatedly, Plaintiffs argue that their claims are distinguishable from those at issue in *Kiobel* because the prohibition against human trafficking is "unique[] among international human rights norms" insofar as it "involves extraterritorial conduct."

However, "[t]hese case-specific policy arguments miss the mark." *Balintulo*, 727 F.3d at 191. The foreign-policy consequences and the international norms underlying the claim are immaterial to our analysis. "The canon against extraterritorial application is 'a presumption about a *statute's meaning*.'" *Id.* (quoting *Morrison*, 561 U.S. at 255) (emphasis in original). Thus, its applicability does not depend on "whether we think 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court.'" *RJR Nabisco*, 136 S. Ct. at 2100 (quoting *Morrison*, 561 U.S. at 261). The presumption applies "across the board, 'regardless of whether there is a risk of conflict between the American statute and a foreign law.'" *Id.* (quoting *Morrison*, 561 U.S. at 255). "Rather than guess anew in each case" as Plaintiffs urge, "we apply the presumption in *all* cases, preserving a stable background against which Congress can legislate with predictable effects." *See Morrison*, 561 U.S. at 261 (emphasis added). The Supreme Court in *Kiobel* held that the presumption applied to the ATS. That ruling binds us in all cases.

### 3. Leave to Amend

Plaintiffs contend that they should have been permitted to amend their complaint to allege aiding and abetting in the United States in light of *Kiobel*. The district court denied this request. "[W]here, as here, the district court's denial of leave to amend was based solely on futility, we apply a de novo standard of review identical, in practice, to the standard used for reviewing a dismissal under Rule 12(b)(6)." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010). In denying Plaintiffs' request, the district court explained that its "decision was based on the summary judgment record, not on the pleadings." The district court noted that because Plaintiffs failed to identify any evidence which was not or could not have been presented to the court prior to its ruling, amendment in this case would be futile.

Plaintiffs on appeal argue that granting leave to amend would comport with the decisions of other courts after *Kiobel* which have allowed plaintiffs to add allegations that might displace the presumption against extraterritoriality. Plaintiffs state they "will be able to allege that U.S.-based managers knew they were obtaining trafficked labor, and continued to do so despite this knowledge." Additionally, Plaintiffs assert that they "will be able to allege the same facts found sufficient in *Al Shimari*." In particular, they claim that they will point to (1) KBR's U.S. corporate citizenship; (2) the U.S. citizenship of the responsible KBR employees; (3) the existence of a contract between KBR and the U.S. government; (4) KBR's U.S.-based managers' approval and cover-up of misconduct; and (5) the express intent of Congress.

We affirm the district court's decision to deny leave to amend. As an initial matter, an aiding and abetting theory of liability was not presented to the district court. Counsel for Plaintiffs reiterated at oral argument that they believed aiding and abetting was already a theory within the original complaint, but were seeking to add allegations that would more specifically

satisfy *Kiobel*'s "touch and concern" test in light of emerging case law. However, while the "touch and concern" test may have been unsettled after *Kiobel*, Plaintiffs had already presented the evidence and made the allegations that supported their argument in favor of displacing the presumption against extraterritoriality.[6] Plaintiffs argue they would be able to allege facts that satisfy *Al Shimari*, but *Al Shimari* is not the test. As we have discussed, our approach requires analysis of the conduct relevant to the statute's "focus." *See Morrison*, 561 U.S. at 266. Plaintiffs essentially seek to plead the same allegations that this Court has found insufficient to displace the presumption against extraterritoriality. Amendment would bring Plaintiffs no closer to satisfying the test articulated in *Morrison* and in *RJR Nabisco*. Accordingly, amendment would be futile.

## B.    The TVPRA Claim

Plaintiffs alleged that KBR's actions violated the TVPRA, 18 U.S.C. §§ 1589, 1590, which prohibits forced labor and human trafficking, respectively. In their first amended complaint, Plaintiffs cited 18 U.S.C. § 1595, the TVPRA's civil-remedy provision, which Congress first enacted in 2003. *See* Pub. L. No. 108-193, 117 Stat. 2878 (2003). Section 1595 permits suits by private parties for violations of, inter alia, § 1589 or § 1590. After Plaintiffs filed their first amended complaint, 18 U.S.C. § 1596 became law. *See* Pub. L. No. 110-457, § 223(a), 122 Stat. 5044 (2008) (codified at 18 U.S.C. § 1596(a)). This provision, entitled "Additional jurisdiction in certain trafficking offenses," provides:

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial

---

[6] As KBR explains, "even after KBR raised *Kiobel* in a supplement to its motion for summary judgment, Plaintiffs still did not seek leave to amend, arguing instead that their claims *as-then-pleaded* satisfied *Kiobel*'s 'touch and concern' language."

jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
> (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. § 1596(a) (the "2008 Amendment").

The parties do not dispute that the 2008 Amendment enables federal courts to entertain a private party's civil suit that alleges extraterritorial violations of the TVPRA. *See Kiobel*, 133 S. Ct. at 1665 ("Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad."). However, because the TVPRA, unlike the ATS, is extraterritorial in scope, Plaintiffs argue that their TVPRA claims are viable under a different theory than the ATS claims. They argue that § 1596—which explicitly rebuts the presumption against extraterritoriality—applies to their pending lawsuit.

However, in seeking to apply § 1596 to pre-enactment conduct, Plaintiffs confront a different canon of statutory interpretation: the presumption against retroactivity. This "presumption against retroactive legislation . . . is deeply rooted in our jurisprudence." *Margolies v. Deason*, 464 F.3d 547, 551 (5th Cir. 2006) (quoting *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997)).

Plaintiffs make two distinct arguments as to why the presumption against retroactivity does not prevent applying § 1596 to their pending lawsuit. First, they claim that § 1596 did not alter the law. Rather, it clarified Congress's intent to allow a civil remedy for extraterritorial violations of the TVPRA. Because the 2008 Amendment merely clarified a meaning extant in the TVPRA at the time of the alleged conduct, it applies to their case. *See, e.g.*,

*Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283 (11th Cir. 1999) ("[C]oncerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify . . . rather than effect a substantive change in the law."); *Liquilux Gas Corp. v. Martin Gas Sales*, 979 F.2d 887, 890 (1st Cir. 1992) (finding it "need not determine" the retroactivity issue because the amendment at issue merely clarified existing law). Second, Plaintiffs claim that even if § 1596 was not merely clarifying, it nonetheless applies to KBR's alleged pre-enactment conduct because it is a purely jurisdictional statute that speaks only to the power of the court rather than the parties' substantive rights. We address each argument in turn.

### 1. Extraterritoriality Prior to the 2008 Amendment

Plaintiffs argue that the 2008 Amendment clarified rather than changed the TVPRA and therefore should apply to their lawsuit. We have observed that "changes in statutory language" do not always "constitute a change in meaning or effect" of that statute. *NCNB Tex. Nat'l Bank v. Cowden*, 895 F.2d 1488, 1500 (5th Cir. 1990) (quoting *United States v. Montgomery Cty.*, 761 F.2d 998, 1003 (4th Cir. 1985)). Rather, Congress may amend a law merely "to make what was intended all along even more unmistakably clear." *Id.* (quoting *Montgomery Cty.*, 761 F.2d at 1003).

Several factors inform whether a statutory amendment merely clarifies the law rather than effects a substantive change. For instance, courts consider: (1) "whether the enacting body declared that it was clarifying a prior enactment"; (2) "whether a conflict or ambiguity existed prior to the amendment"; and (3) "whether the amendment is consistent with a reasonable interpretation of the prior enactment." *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 642 (7th Cir. 2016) (quoting *Middleton v. City of Chicago*,

578 F.3d 655, 663–64 (7th Cir. 2009)); *see also FDIC v. Belli*, 981 F.2d 838, 841 (5th Cir. 1993).

We begin with the original act—the civil-remedy provision, 18 U.S.C. § 1595—and conclude that it was not ambiguous. At the time Congress added a civil remedy in 2003, the law regarding extraterritoriality was clear: it was "assume[d] that Congress legislates against the backdrop of the presumption against extraterritoriality." *Arabian Am. Oil Co.*, 499 U.S. at 248. Thus, a law was presumed not to apply extraterritorially absent "the affirmative intention of the Congress clearly expressed." *Id.* (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957)).

Notably, other provisions of the TVPRA expressly contemplated overseas endeavors, such as § 107, which established "initiatives in foreign countries to assist . . . victims of human trafficking." Trafficking Victims Protection Act, Pub. L. No. 106-386, § 107(a) (2000) (codified at 22 U.S.C. § 7105). However, there is no express indication of extraterritorial application in the private cause-of-action provision, § 1595, or its substantive prohibitions, §§ 1589 and 1590. Rather, the pre-2008 TVPRA was silent on whether the civil remedy applies extraterritorially. In light of the well-established presumption against extraterritoriality, we conclude that § 1595 unambiguously did not apply extraterritorially until § 1596 was enacted.

Further, nothing in the text of § 1596 expressly indicates that Congress intended to clarify rather than change the TVPRA. *See Middleton*, 578 F.3d at 664; *Belli*, 981 F.2d at 841. Rather, as the provision's title indicates, it provided "[a]dditional jurisdiction."[7] Indeed, the two courts to address TVPRA's civil

---

[7] The Fifth Circuit has held that the legislative history may be informative in discerning whether a law was clarifying. *See Belli*, 981 F.2d at 841; *Cowden*, 895 F.2d at 1500. However, in this case, Plaintiffs have failed to introduce any evidence in the legislative history to support their view. Even if we were to rely on the legislative history, we find that it supports the view that Congress expanded jurisdiction rather than simply clarifying

remedy provision before 2008 held that the law did not provide a cause of action for extraterritorial conduct. *See Nattah v. Bush*, 541 F. Supp. 2d 223, 234 (D.D.C. 2008), *aff'd in part, rev'd in part on other grounds*, 605 F.3d 1052 (D.C. Cir. 2010); *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 999–1004 (S.D. Ind. 2007). As such, in contrast to cases where this Court has held an amendment was clarifying, there was no circuit split or conflict that "provoked" Congress to "enact an amendment to clarify rather than change the law." *Cowden*, 895 F.2d at 1501.

Plaintiffs' only argument is nontextual circumstantial evidence: the 2008 Amendment "was passed promptly after cases questioning the TVPRA's extraterritorial application"—specifically, the district court decisions in *Nattah* and *John Roe I*. We may consider the circumstances surrounding the enactment to determine whether it was clarifying. *See Laubie v. Sonesta Int'l Hotel Corp.*, 752 F.2d 165, 168 (5th Cir. 1985).

However, in this case, we find Plaintiffs' theory of temporal proximity unavailing. The question is whether, in passing § 1596, Congress "merely intended to clarify what it had meant all along" in the TVPRA's civil-remedy provision. *Belli*, 981 F.2d at 840. Nothing in the text of the pre-2008 TVPRA or in the text of § 1596 indicates that a plaintiff was allowed to sue for extraterritorial violations of the TVPRA before 2008.

Further, we find *Laubie*, the case relied on by Plaintiffs, distinguishable. In that case, this Court held that a Louisiana state law was clarifying based on the "the timing of the amendment[] and its language." *Laubie*, 752 F.2d at 168. Here, the language indicates that the 2008 Amendment is not clarifying.

---

existing jurisdiction. The House Report for the original version of what became the 2008 amending act states: "This section *provides jurisdiction* to U.S. courts." H.R. Rep. No. 110-430(I), at 55 (2007) (emphasis added). The language "provides jurisdiction" implies that such jurisdiction did not already exist.

In contrast to *Laubie*, Plaintiffs' only evidence is timing. But it is not evident that the temporal proximity between the two district court rulings and § 1596's enactment—by itself—supports their claim. It is equally plausible to infer based on timing alone that Congress amended the TVPRA to provide a civil remedy for extraterritorial violations because it had concluded none previously existed. Indeed, a district court recently made just that inference. *See St. Louis v. Perlitz*, No. 3:13-CV-1132, 2016 WL 1408076, at *2 (D. Conn. Apr. 8, 2016) ("That Congress added [§ 1596,] a new provision explicitly giving extraterritorial effect to § 1591[, the TVPRA's prohibition on sex trafficking,] further supports the conclusion" that the law did not apply extraterritorially before the amendment.). Such lack of clarity regarding Plaintiffs' evidence of timing is precisely why we have admonished that "reliance on subsequent legislative actions to determine the meaning of an earlier statute is hazardous." *Cowden*, 895 F.2d at 1500. Accordingly, given that nothing in the text of the TVPRA either in 2004 or today indicates that Plaintiffs could assert a civil remedy for extraterritorial violations before § 1596 was enacted, the amendment's timing fails to persuade us that the law was a clarifying amendment.

### 2. *The 2008 Amendment's Retroactive Effect*

The district court also held that the presumption against retroactivity prevents applying § 1596 to KBR's pre-enactment conduct, reasoning that the law was not merely jurisdictional. The presumption against retroactivity "is based on 'the unfairness of imposing new burdens on persons after the fact.'" *Hartford Cas. Ins. Co. v. FDIC*, 21 F.3d 696, 700 (5th Cir. 1994) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994)). The Supreme Court's decision in *Landgraf v. USI Film Products* provides the two-step framework for addressing retroactivity questions.

First, we consider "whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If Congress has addressed the issue, a court need not rely on the "judicial default rules." *Id.* But if "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect." *Id.* A statute, however, does not have a retroactive effect "merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law." *Id.* at 269 (internal citation omitted). Rather, a retroactive effect is present when that statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. "If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

However, there are situations where a court must "apply the law in effect at the time it renders its decision." *Id.* at 273 (quoting *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (2006)). "Such situations generally involve procedural changes to existing law, including statutes which merely alter jurisdiction." *Hartford Cas. Ins.*, 21 F.3d at 700. Jurisdiction-altering rules "usually" do not have retroactive effect because such rules "take[] away no substantive right but simply change[] the tribunal that is to hear the case." *Id.* at 701 (quoting *Landgraf*, 511 U.S. at 274). In other words, a jurisdictional statute has no retroactive effect if it "affect[s] only where a suit may be brought, not whether it may be brought at all." *Hughes Aircraft*, 520 U.S. at 951.

Plaintiffs do not argue that Congress has "expressly prescribed" the temporal reach of the TVPRA. Thus, we proceed to the second step to address whether § 1596 has a retroactive effect.

Plaintiffs claim that § 1596 has no retroactive effect because it is "purely jurisdictional." They argue that the 2008 Amendment, entitled "Additional

jurisdiction in certain trafficking offenses," only "enlarges the jurisdiction of U.S. courts" by providing them with "extraterritorial jurisdiction over trafficking offenses."

The Supreme Court's decision in *Hughes Aircraft* is instructive. That case concerned whether an amendment to the False Claims Act ("FCA") could be applied retroactively. *Hughes Aircraft*, 520 U.S. at 941. Prior to the amendment, the FCA barred a private party's qui tam suit "based on information already possessed by the Government." *Id.* at 944. The amendment eliminated this bar in some circumstances. *Id.* at 941. The court of appeals held that the amendment "removing certain defenses to *qui tam* suits should be applied retroactively to suits based on pre-[enactment] conduct because the amendment involved only the 'subject matter jurisdiction' of courts to hear *qui tam* claims and did not affect the substantive liability of *qui tam* defendants." *Id.* at 944–45.

The Supreme Court reversed, reasoning that the amendment had a retroactive effect under *Landgraf*. *Id.* at 946–47. The Court reasoned that the amendment "change[d] the substance of the existing cause of action for *qui tam* defendants" by "eliminat[ing] a defense to a *qui tam* suit—prior disclosure to the Government." *Id.* at 948. The Court also found that the amendment "essentially create[d] a new cause of action" for private parties. *Id.* at 950. Before the amendment, "once the United States learned of a false claim, only the Government could assert its rights under the FCA against the false claimant." *Id.* at 949. The amendment therefore resulted in an "extension of an FCA cause of action to private parties in circumstances where the action was previously foreclosed." *Id.*

Further, the Court rejected the qui tam plaintiffs' argument that because the amendment was "jurisdictional," the "general *Landgraf* presumption against retroactivity" did not apply. *Id.* at 950. The Court explained that

jurisdiction-allocating statutes are not categorically exempt from the *Landgraf* analysis. *Id.* at 950. Rather, "[t]he fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity." *Id.* at 951. The Court explained that the legal effect of this jurisdictional amendment was not limited to "merely allocat[ing] jurisdiction among forums." *Id.* The amendment also "create[d] jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well." *Id.* As a result, the FCA amendment was "as much subject to [the] presumption against retroactivity as any other." *Id.*

The Supreme Court's decision in *Martin v. Hadix*, 527 U.S. 343 (1999), confirms that the mere fact that a statute is jurisdictional does not fully resolve the retroactivity inquiry. As the Court explained, "[w]hen determining whether a new statute operates retroactively, it is not enough to attach a label (*e.g.*, 'procedural,' 'collateral') to the statute." *Id.* at 359. Instead, under *Landgraf*, our retroactivity inquiry "demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Id.* at 357–58 (quoting *Landgraf*, 511 U.S. at 270).

The 2008 Amendment, although jurisdictional in nature, alters a party's substantive rights under the TVPRA. Prior to § 1596, a private party could not maintain a civil cause of action under the TVPRA for forced labor or human trafficking that occurred overseas. Such an action, as noted, would have been barred by the presumption against extraterritoriality. However, by conferring "extra-territorial jurisdiction over any offense . . . under" the TVPRA, § 1596 permits private parties to pursue a civil remedy under the TVPRA for extraterritorial violations. As with the amendment in *Hughes Aircraft*, § 1596

has the legal effect of "eliminat[ing] . . . a prior defense." 520 U.S. at 950. After § 1596's enactment, a TVPRA defendant in a civil suit could no longer rely on a previously available defense: the presumption against extraterritoriality. Indeed, Plaintiffs do not identify any forum in which they could have permissibly brought a TVPRA civil cause of action based on their allegations.[8] Consequently, because § 1596 "creat[ed] jurisdiction" for a TVPRA civil case "where none previously existed" it "speaks not just to the power of a particular court but to the substantive rights of the parties as well." *See id.* at 951.

Further, Plaintiffs' emphasis that § 1596 did not alter the unlawfulness of the alleged conduct under the TVPRA is misplaced. In *Hughes Aircraft*, the federal government would have been able to bring suit against the defendant for the conduct alleged by the private plaintiffs. Prior to § 1596's enactment, the federal government could have criminally prosecuted parties for extraterritorial violations of §§ 1589 and 1590, the prohibitions against human trafficking and forced labor that KBR is alleged to have violated. *See* 18 U.S.C. § 3261. However, despite these pre-existing criminal prohibitions, § 1596 exposed a TVPRA defendant to civil claims brought by private parties. Such a result fits squarely within *Hughes Aircraft*'s reasoning: "In permitting actions by an expanded universe of plaintiffs with different incentives [than the federal

---

[8] Plaintiffs rely heavily on *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 637 F.3d 454 (4th Cir. 2011). However, *Gordon* is distinguishable. That case involved § 307 of the Servicemembers Civil Relief Act ("SCRA"), which "prohibits enforcement of liens against servicemembers during military service." *Id.* at 456 (citing 50 U.S.C. app. § 537). The question was whether a new federal law—§ 802 of the SCRA—which provided a federal cause of action to enforce § 307's protections would have a retroactive effect under *Landgraf*. *Id.* at 458–59. The Fourth Circuit found that the new federal law did not "impair[] the parties' rights or impose[] new duties" because § 307's right of non-foreclosure "was already enforceable" in a state court conversion act. *Id.* at 459–60 ("In fact, § 307 contemplates that the owner's right might be enforced in a conversion action."). By contrast, Plaintiffs have not asserted that they could have enforced TVPRA's substantive protections—i.e., § 1589 and § 1590—before the 2008 Amendment. Thus, unlike the law in *Gordon*, the 2008 Amendment made the TVPRA's conduct-regulating provisions enforceable in civil suits for a new class of claims.

government], the [2008 Amendment] essentially creates a new cause of action." *See* 520 U.S. at 950.

Plaintiffs counter that even if § 1596 removed a defense to a civil suit under the TVPRA, the law nonetheless did not alter the parties' substantive rights given other laws in effect at the time of the alleged conduct. Specifically, they contend that KBR was already "civilly liable for the same conduct under common law and Iraqi law, which provide the same tort remedies." Under this interpretation, permitting Plaintiffs to pursue their TVPRA claims would have no retroactive effect if the parties' rights and remedies under the TVPRA are identical to their pre-existing rights and remedies under other laws.

In support, Plaintiffs cite two cases in which other courts have found that the Torture Victim Protection Act—which created a civil cause of action for torture—would not have a retroactive effect because it created "no new liabilities" and did not "impair rights." *See Cabello v. Fernández-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005); *Alvarez-Machain v. United States*, 107 F.3d 696, 702 (9th Cir. 1996). Both of these cases, however, concluded that the Torture Victim Protection Act was indistinguishable from claims made available under the ATS. *Cabello*, 402 F.3d at 1154; *Alvarez-Machain*, 107 F.3d at 702–03.

By contrast, Plaintiffs cannot prove there exist parallel rights and remedies under the ATS. After *Kiobel*, Plaintiffs' extraterritorial ATS claims are barred, and the 2008 Amendment removed the previously available defense of extraterritoriality. The ATS cannot be said to provide parallel rights or remedies to Plaintiffs' extraterritorial TVPRA claims. *See Kiobel*, 133 S. Ct. at 1663–65.

Plaintiffs also argue that the parties' rights and liabilities under pre-existing foreign and state law defeat the district court's conclusion that § 1596 attaches new legal consequences. We find these arguments unavailing. First,

Plaintiffs cite the Iraqi Civil Code, which they argue authorizes tort victims—including victims of trafficking—to bring claims for civil remedies. Yet, even if KBR may be liable under Iraqi law, Plaintiffs have not proven that the remedies under the TVPRA and Iraqi Civil Code are co-extensive. Plaintiffs, for instance, seek punitive damages in this case. But whereas the TVPRA authorizes punitive damages, *Francisco v. Susano*, 525 F. App'x 828, 835 (10th Cir. 2013); *Ditullio v. Boehm*, 662 F.3d 1091, 1096 (9th Cir. 2011), no such damages are available under Iraqi law, *Harris v. Kellogg, Brown & Root Servs., Inc.*, 796 F. Supp. 2d 642, 666 (W.D. Pa. 2011). "Retroactive imposition of punitive damages" is precisely what the Supreme Court found problematic in *Landgraf*. *See* 511 U.S. at 281.

Second, Plaintiffs cite the "transitory tort doctrine," arguing that KBR would have been liable under state tort law. But Plaintiffs' state law claims are barred by the statute of limitations. Allowing Plaintiffs to retroactively bring a TVPRA claim would eliminate that defense, thereby imposing new liability to KBR. *See Hughes Aircraft*, 520 U.S. at 948. Additionally, Plaintiffs' rights or remedies under expired claims cannot be said to parallel the remedies that the TVPRA would make available if applied. Consequently, allowing Plaintiffs to bring a TVPRA claim would have an impermissible retroactive effect.

### 3. *The MEJA's Criminal Jurisdiction*

Plaintiffs alternatively rely on the Military Extraterritorial Jurisdiction Act ("MEJA") as a basis for jurisdiction for the TVPRA civil claims. Plaintiffs contend that the TVPRA's civil remedy attaches whenever a person subject to the court's jurisdiction commits a trafficking offense—regardless of whether the person is criminally prosecuted. In other words, Plaintiffs argue that MEJA's limited extraterritorial extension of a host of federal offenses, including §§ 1589 and 1590 of the TVPRA, can be married with TVPRA's civil-

remedy provision to provide an alternative "jurisdictional" basis for Plaintiffs' claim. MEJA applies to "[c]riminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States." 18 U.S.C. § 3261. Plaintiffs argue that when Congress enacted the 2008 Amendment, it built upon the existing TVPRA and MEJA framework and did not exempt TVPRA violations by MEJA-covered persons. However, Plaintiffs do not cite any cases in which MEJA triggered the TVPRA and permitted jurisdiction.

It is undisputed that the TVPRA provisions KBR is alleged to have violated—§ 1589 and § 1590—could have been prosecuted under MEJA. However, this Court declines to find that MEJA's grant of criminal jurisdiction over felony offenses committed abroad gives Plaintiffs an alternative jurisdictional basis for their civil claims. Congress must clearly express an affirmative intention to give a statute extraterritorial effect. *Morrison*, 561 U.S. at 255. It is simply not clear that Congress affirmatively intended to give extraterritorial effect to the TVPRA civil-remedy provision via an unrelated criminal statute that is nowhere referenced in the TVPRA. We agree with the district court's conclusion that MEJA is "simply not relevant to the question of whether Congress intended to legislate extraterritorially when it enacted . . . the TVPRA." The connection between these statutes is too attenuated for the Court to find jurisdiction on this basis.

## C.    The State Law Claims

The district court dismissed Plaintiffs' negligence claims as time barred under California or Texas law and declined to toll the claims. Plaintiffs argue that if their claims did not touch and concern the United States, then the choice-of-law analysis should have led to the application of Iraqi law. KBR contends that Plaintiffs cannot revive their state law negligence claims by invoking Iraq's statute of limitations for the first time on appeal. KBR argues

that Plaintiffs waived any right to the application of Iraqi law by not raising that argument earlier and that the district court properly rejected Plaintiffs' conclusory arguments for tolling the limitations.

Plaintiffs argue there is no waiver when there is a change in law. They cite *McGee v. Arkel Int'l, LLC*, 671 F.3d 539 (5th Cir. 2012), as a case in which "this Circuit held for the first time that Iraqi law may apply to contractor conduct in Iraq." The problem, however, is that even if this Court viewed *McGee* as changing the law, it issued that opinion in 2012. While Plaintiffs discussed *McGee* in 2014, they did not make this argument until 2015 on appeal. The district court initially issued an order in 2009 addressing only California and Texas law. The district court entertained a motion to reconsider, and there were other opportunities for Plaintiffs to request the application of the Iraqi statute of limitations.

In the alternative, Plaintiffs argue that if California or Texas law applies, the Court should apply equitable tolling. "The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." *United States v. Patterson*, 211 F.3d 927, 930 (5th Cir. 2000) (quoting *Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998)). Courts apply equitable tolling "principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Id.* (citations omitted). We review the district court's decision to deny equitable tolling for abuse of discretion, unless the district court denied tolling as a matter of law. *See Palacios v. Stephens*, 723 F.3d 600, 603 (5th Cir. 2013).

Plaintiffs argue that the civil conflict in Nepal delayed their suit. The district court rejected this argument, finding that "[g]eographic location and personal hardship cannot provide the sole basis for tolling an otherwise applicable statute of limitations." Moreover, the district court cited Plaintiffs'

No. 15-20225

other potential avenues for relief. We find the district court did not abuse its discretion in denying tolling.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM.

No. 15-20225

JAMES E. GRAVES, JR., Circuit Judge, concurring in part, dissenting in part:

I.

I concur with the majority's decision on Plaintiffs' non-ATS claims. But this case squarely raises the question that *Kiobel* expressly left open: under what circumstances do a plaintiff's "claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application [of the ATS]." *Kiobel*, 133 S. Ct. at 1669. And on this question, I part ways with the majority. Plaintiffs here allege that a U.S. military contractor participated in a human trafficking scheme in order to fulfill its contract with the U.S. government to provide labor on a U.S. military base. There is much to support the conclusion that these claims "touch and concern" the United States. Therefore, I respectfully dissent.

## A. *Kiobel*'s "Touch and Concern" Test

The majority adopts an unnecessarily restrictive view as to the meaning of *Kiobel*'s "touch and concern" language by engaging in a formalistic application of the *Morrison* "focus" test. The majority's application of the "focus" test belies the *actual* focus of the ATS and is inconsistent with the Supreme Court's ATS jurisprudence. In the majority's reading of the "touch and concern" test, only "domestic conduct . . . sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations" would permit extraterritorial application of the ATS. *See Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring)). Rather than assessing what would displace the presumption against extraterritorial application of the ATS, *id.* at 1669, however, this test would eliminate the extraterritorial reach of the statute completely. If the alleged ATS violations must take place on domestic soil, the *Kiobel* majority's statement regarding "touch and concern" would be meaningless. In my view, the defendant's conduct here falls squarely within the focus of the ATS, and the claims,

therefore, touch and concern the United States with sufficient force to displace the presumption against extraterritorial application.

The majority gives inordinate weight to *RJR Nabisco* in its application of *Kiobel*'s "touch and concern" test. Although I agree with the majority that *RJR Nabisco* sets forth a two-step framework for analyzing extraterritoriality issues and suggests that we should interpret *Kiobel*'s "touch and concern" language in light of the step-two "focus" inquiry, derived from *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. at 2883–88, I do not agree that *RJR Nabisco* is somehow "determinative" of the issues in this case. *RJR Nabisco*, like *Kiobel*, stopped after step one. In *RJR Nabisco*, the Court determined that Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) was not expressly extraterritorial and thus requires a civil RICO plaintiff to allege and prove a domestic injury. 136 S. Ct. at 2111. The plaintiffs, however, had filed a stipulation in the district court waiving their damages claims for domestic injuries. Therefore, as in *Kiobel*, all the "relevant conduct" took place outside the United States. *RJR Nabisco* no more illuminates the "focus" inquiry at step two than does *Kiobel*, and it leaves open the questions of how to interpret the focus of the ATS, what conduct is relevant to that focus, and how courts should proceed when there is potentially relevant conduct both within and outside the United States.

The majority then reasons that the "ATS 'focus' analysis" involves examining "the conduct alleged to constitute violations of the law of nations, and the location of that conduct" (quoting *Mastafa*, 770 F.3d at 185). I have no issue with this broad proposition; however, it is no simple matter to apply it to a case, such as this one, where the alleged conduct is comprised of several constituent actions that are part of an overall course of conduct constituting a violation of the law of nations. The particular violation alleged here, human trafficking, is a transnational crime that uses a global supply chain, which

No. 15-20225

typically extends across multiple countries and requires an extensive transnational network to succeed. The crime is accomplished through a dense system of recruiters, contractors, subcontractors, and parent corporations that cross cities, states, countries, and continents.[1] Each participant undertakes actions, such as recruitment, transportation, detention, and employment that form part of the overall criminal enterprise. While some of these actions, in isolation, may not constitute a violation of the law of nations, they nevertheless constitute "relevant conduct" for purposes of the "focus" inquiry, if they play an integral role in the law of nations violation.

In addition, I am mindful that the "focus" inquiry centers on the *conduct* that constitutes the alleged law of nations violation. But surely the inquiry permits consideration of pertinent facts underlying the plaintiff's claim, such as the identity of the defendant, the nature of the defendant's liability (*direct or indirect*), the type of violation alleged, and any significant connections the alleged violation has to the United States, above and beyond necessary allegations of relevant conduct occurring in the United States. While *Morrison* and *RJR Nabisco* are instructive in analyzing how the presumption against extraterritoriality should be applied to statutes generally, the Supreme Court's ATS-specific precedents, *Kiobel* and *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), must also guide our "focus" inquiry in the context of the ATS. *Sosa* and *Kiobel* demonstrate that such factors are central to the analysis of an ATS claim, and therefore they ought to inform our examination of the relevance of the alleged conduct, particularly any domestic conduct, to the focus of the ATS.

Notably absent from the majority opinion is any mention of the fact that KBR is a U.S. corporation, which Plaintiffs argue distinguishes this case from

---

[1] *See, e.g.*, U.S. Department of State, *Trafficking in Persons Report* (July 2015), at 13–18, *available at* https://www.state.gov/documents/organization/245365.pdf.

the "foreign-cubed" scenario in *Kiobel*. By omitting any mention of this fact, the majority presumably agrees with the Second Circuit (currently alone in this view) that a defendant's U.S. citizenship has no relevance to the "focus" analysis. *See Mastafa*, 770 F.3d at 189. But *Kiobel* itself made clear that the citizenship of the defendant is not inconsequential. In the same paragraph describing the "touch and concern" exception to the presumption against extraterritoriality, the *Kiobel* majority opined that "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices." 133 S. Ct. at 1669. Some courts and commentators have taken this statement to mean that, although a corporation's presence in the United States may be insufficient, standing alone, to displace the presumption against extraterritoriality, the fact of a defendant's U.S. citizenship has some relevance to whether the claims touch and concern the United States. *E.g.*, *Doe v. Drummond*, 782 F.3d 576, 594 (11th Cir. 2015) ("*Kiobel* implicitly supports that citizenship or corporate status may be relevant to whether a claim touches and concerns the territory of the United States, given that, after it set forth the test, it determined that 'mere corporate presence' was insufficient."); Sarah H. Cleveland, *After Kiobel*, J. Int'l Crim. Just. (2014) 12 (3): 551 (explaining that "although mere corporate presence was not enough in *Kiobel*" the majority opinion left open whether "domicile or nationality of a defendant corporation or individual could be sufficient").

*Sosa* also provides guidance as to the focus of the ATS. In *Sosa*, the Court examined historical materials at the time of the ATS's enactment to determine that in the 18th century, the law of nations comprised two principal elements: norms governing behavior of nation states toward each other and "a body of judge-made law regulating the conduct of individuals situated outside domestic boundaries and consequently carrying an international savor." 542 U.S. at 714–15. The law of nations required sovereigns to provide redress for

law of nations violations in at least three circumstances: (1) when the violation occurred on a sovereign's territory; (2) when *a sovereign's subject committed the violation*; and (3) when a perpetrator used the sovereign's territory as a safe harbor to avoid punishment for having committed great wrongs. *See* Anthony J. Bellia Jr & Bradford R. Clark, *The Alien Tort Statute and the Law of Nations,* 78 U. Chi. L. Rev. 445, 471–76 (2011); *see also Restatement (Third) of Foreign Relations Law* § 402 ("Subject to [the reasonableness requirement of] § 403, a state has jurisdiction to prescribe law with respect to (1) (a) conduct that, wholly or in substantial part, takes place within its territory; (b) the status of persons, or interests in things, present within its territory; (c) conduct outside its territory that has or is intended to have substantial effect within its territory; (2) *the activities, interests, status, or relations of its nationals outside as well as within its territory . . .*") (emphasis added). Failure to provide such redress implicated the sovereign as an accomplice in the violation and risked reprisal from the nation suffering the wrong. *See* 4 William Blackstone, Commentaries on the Law of England 67–68 (1769); Emmerich de Vattel, Law of Nations, Book II, ch. 6, § 76 (1758) (a sovereign "ought not to suffer his subjects to molest the subjects of other states, or to do them an injury"). Consequently, U.S. citizens committing international law violations abroad had the potential to implicate the United States in diplomatic conflicts.

In sum, concerns about foreign relations were central to the ATS's passage.[2] "The statute's purpose was to address 'violations of the law of

---

[2] The majority nevertheless states that "foreign-policy consequences and the international norms underlying the claim are immaterial to our analysis." In support, the majority cites *RJR Nabisco*'s statement that a presumption about a statute's meaning applies "across the board, 'regardless of whether there is a risk of conflict between the American statute and a foreign law,'" 136 S. Ct. at 2100 (quoting *Morrison*, 561 U.S. at 261). *RJR Nabisco*, however, was referring, not to the "focus" inquiry at step two of the extraterritoriality analysis, but to step one, when a court must determine whether the presumption applies to the statute at all. Concerns that were central to Congress's purpose

nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs.'" *Kiobel*, 133 S. Ct. at 1672 (Breyer, J., concurring) (quoting *Sosa*, 542 U.S. at 715). Prior to the enactment of the ATS, Congress was frustrated by the federal government's incapacity to vindicate rights under the law of nations. *Sosa*, 542 U.S. at 716–17. Congress enacted the ATS as an important federal enforcement mechanism intended to enable the United States as a fledgling nation to meet its obligations under the law of nations and avoid diplomatic strife with other nation states.

Given the proliferation of international agreements condemning human trafficking and forced labor, surely these foreign policy concerns are no less pertinent in the present day. Among several international accords concerning trafficking, the United States has signed and ratified a treaty that asks signatories to hold their citizens responsible for transnational trafficking.[3] Human trafficking has been condemned as a modern-day form of slavery. The slave trader, like the pirate, is "*hostis humani generis*, an enemy of all mankind." *See Sosa*, 542 U.S. at 732 (quoting *Filartiga v. Pena–Irala*, 630 F.2d 876, 890 (2d Cir. 1980)).[4] "And just as a nation that harbored pirates provoked the concern of other nations in past centuries, so harboring 'common enemies

---

in enacting the statute, such as the foreign-policy implications of a defendant's conduct with respect to the ATS, are by definition material to the step two analysis of the statute's focus and of whether the conduct at issue is relevant to that focus.

[3] *See* Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319, *available at* https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-12-a&chapter=18&clang=_en.

[4] Notably, an interpretation of "touch and concern" that requires conduct constituting a violation of the law of nations within the United States fails to address piracy, which the *Kiobel* Court deemed to fall within the ambit of ATS jurisdiction, despite its occurrence on the high seas. 133 S. Ct. at 1667.

of all mankind' provokes similar concerns today." *Kiobel*, 133 S. Ct. at 1673 (Breyer, J., concurring) (internal reference omitted).

These foreign policy concerns are particularly heightened where, as here, the defendant's conduct directly implicates the United States and its military. KBR was one of the largest U.S. military contractors operating in Iraq. While KBR was allegedly exploiting trafficked labor at Al Asad, the U.S. government and military were engaged in an aggressive anti-trafficking campaign. "Contractors provide crucial support for the U.S. military and are perceived internationally as an extension of the military."[5] Congress repeatedly expressed concern that failure to hold U.S. military contractors accountable for human trafficking overseas undermines U.S. foreign policy.

This case substantially implicates the interests of the United States, both domestically and abroad. While these considerable connections to the United States may not be dispositive to the extraterritoriality inquiry, they are of critical importance to analyzing the focus of the ATS. At a minimum, they counsel a hard look at any domestic conduct alleged on the part of the defendant. It simply contravenes the *focus* of the ATS to disregard these facts entirely.

## B. Application of the "Touch and Concern" Test to the Summary Judgment Record

Properly applying the "touch and concern" test here leads to the conclusion that Plaintiffs have adduced sufficient evidence of domestic conduct relevant to the alleged law of nations violation to displace the presumption against extraterritorial application of the ATS. Plaintiffs contend that the

---

[5] Amici curiae retired U.S. military officers explain that during the events at issue, the United States retained both exclusive control of the Al Asad Airbase and practical control over Iraqi territory. Although this may not be sufficient to render Al Asad *de facto* territory of the United States, it most certainly implicates the United States in KBR's conduct at Al Asad.

district court's analysis of the evidence in the summary judgment record was improper. I agree.

Plaintiffs allege a number of actions by KBR occurring in the United States that form part of the alleged law of nations violations on which their ATS claims are based. Plaintiffs allege that KBR is directly liable for the torts of human trafficking and forced labor. In support of their allegations, Plaintiffs submitted evidence of U.S.-based conduct by KBR that evinced their participation in a transnational trafficking scheme that ensnared Plaintiffs. Specifically, Plaintiffs offered that KBR transferred payments to the labor broker, Daoud, from the United States, using New York banks. These payments were made pursuant to KBR's subcontract with Daoud, the Master Agreement of which had been executed by a U.S.-based KBR employee located in Houston. Daoud was the *only* approved source for obtaining third-country national ("TCN") temporary laborers at the Al Asad Airbase. The majority states that Plaintiffs "failed to connect the alleged international law violations to these payments or demonstrate how such payments—by themselves—demonstrate that KBR's U.S.-based employees actually engaged in trafficking the Deceased or forcing Plaintiff Gurung to work on its base." But no inferential leap is required to find payment for trafficked labor to be an action critical to the operation of a global trafficking scheme. This is domestic conduct relevant to the alleged law of nations violation.

Plaintiffs have also offered evidence raising the inference that U.S.-based employees knew about the human rights abuses by Daoud and KBR overseas while KBR continued to use Daoud as a supplier of cheap labor. On this point, the majority summarily adopts the district court's conclusion that Plaintiffs' evidence of KBR's knowledge "only implicated KBR's operations overseas." Plaintiffs assert, however, that they did present evidence of knowledge implicating KBR's U.S. operations. But the district court

41

No. 15-20225

improperly weighed this evidence against other evidence and drew conflicting inferences therefrom. *See Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013) ("A court considering a motion for summary judgment must . . . draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. In addition, a court must disregard all evidence favorable to the moving party that the jury is not required to believe." (internal quotations and citations omitted)).

In a footnote, the district court noted that Plaintiffs' "most damning piece of evidence" was a decision by a U.S.-based employee to terminate a consultant working for KBR at Al Asad after he complained regarding the treatment of third-country nationals employed by Daoud, including, quite pertinently, Plaintiffs in this suit. The district court, however, discounted this evidence of "U.S.-based complicity" because the U.S. employee who decided to "pull" the consultant from Al Asad simultaneously requested an independent investigation into the consultant's complaints. Moreover, the district court made no mention of other evidence that two KBR employees from Houston, including an investigator, flew to the Middle East to threaten the consultant with termination following the escalation of his complaints.

And the record demonstrates that this was not the only complaint of abuses at Al Asad that made its way to the United States. The district court noted but assigned no significance to evidence that "complaints from a U.S. Marine regarding ill treatment of third-country nationals at Al Asad were forwarded through KBR's U.S.-based employees to on-site base staff." The email message, titled "Problem with Halliburton Subcontractor in Iraq," was forwarded with the comment, "If true, fixe [sic] it, if not, ignore it."

Furthermore, these specific incidents occurred against the backdrop of media reports and growing international concern regarding potential human trafficking and other labor abuses by U.S. military contractors in Iraq, as well

42

as an aggressive anti-trafficking campaign by the U.S. military and agencies including the Department of Defense, targeted at U.S. military contractors.[6] It defies reason to conclude that all KBR employees in the U.S. were oblivious to these controversies. But Plaintiffs' theory does not rely on inference alone.

Plaintiffs offered evidence that KBR's U.S.-based employees managed KBR's responses to press and governmental inquiries into human trafficking. For example, in response to a May 2004 New York Times inquiry regarding human trafficking, a U.S.-based employee wrote to his colleagues: "[T]he press continues to dig up these stories and Houston insists on answering each one."

U.S.-based employees also were involved in fielding questions from Time Magazine's New Delhi Bureau after the Indian government in May 2004 requested clarification from the U.S. government concerning reports that Indian nationals working at Al Asad wished to return home but "were being compelled to continue to remain in Iraq against their will." The Indian Ambassador had lodged a formal complaint specifically mentioning Daoud's delay in repatriating third-country nationals who wished to return home and KBR's "abdication of responsibility." Time's questions were forwarded in the KBR email chain along with suggested responses. Some examples include:

> [H]ow much responsibility does Halliburton accept for what essentially amounts to human trafficking by your subcontractors? Will you be investigating? *[L]egal needs to address . . . but we should probably make a general statement that we do not know that*

---

[6] For example, in 2002, President Bush announced that "[t]he United States hereby adopts a 'zero tolerance' policy regarding U.S. Government employees and contractor personnel representing the United States abroad who engage in trafficking in persons." President George W. Bush, National Security Presidential Directive-22 (Dec. 16, 2002), *available at* http://www.combat-trafficking.army.mil/documents/policy/NSPD-22.pdf). The directive required departments and agencies to investigate and punish, as appropriate, those personnel who engage in trafficking. *Id.* at 4. Pursuant to this policy, the Department of Defense implemented specific procedures to combat trafficking on military bases, including vigorous anti-trafficking investigations.

*these men were employed by any KBR subcontractor, that KBR is not the only contractor in Iraq. . . .*

What is your response to the Indian workers' claims that they were "slaves"? *I'd probably say something like:  We cannot respond to this. This issue needs to be address [sic] to the firm that employed them.*

In July 2004, the Washington Post published an article describing KBR's frequent use of debt bondage in Iraq, after which the Department of Defense immediately implemented measures requiring contractors to meet minimum compensation levels, create individual employment contracts, and establish other procedures to eliminate trafficking and forced labor. Despite such high-profile inquiries and governmental pressure, KBR continued to employ Daoud as its labor broker for staffing needs at Al Asad.

At a minimum, the evidence tends to show that some U.S.-based employees knew about the allegations of abuses embroiling KBR's overseas operations. Further, drawing all reasonable inferences in Plaintiffs' favor, a jury could conclude on this record that U.S. employees failed to properly investigate these accusations of human rights abuses by KBR overseas and either willfully ignored evidence of such abuses or actively sought to cover up the misconduct. *Cf. Al Shimari*, 758 F.3d at 522, 531 (finding this type of domestic conduct sufficient to displace the presumption against extraterritoriality). The district court erred in concluding that this evidence failed to raise a genuine dispute of material fact sufficient to overcome KBR's motion for summary judgment.[7]

---

[7] The majority states that "Plaintiffs effectively concede" that they failed to introduce any evidence indicating that KBR's U.S.-based employees were aware of Daoud's recruitment practices or worked to prevent those practices from coming to light or prevent their discontinuance because Plaintiffs argue that they "'would have specifically alleged such conduct by U.S.-based KBR employees' had they been permitted to amend their complaint." In light of the aforementioned evidence in the record, I fail to see how Plaintiffs' request for leave to amend

II.

The majority also affirms the district court's decision to deny Plaintiffs leave to amend on futility grounds. I disagree that Plaintiffs' proposed amendments would necessarily be futile. First, there is already evidence of relevant domestic conduct in the record, which was prepared well before discovery closed. Allowing leave to amend for the parties to conduct further discovery targeted at domestic conduct sufficient to satisfy *Kiobel*'s "touch and concern" test would be reasonable and not clearly an exercise of futility. Second, Plaintiffs' alternative grounds for amendment—to allege a theory of aiding and abetting in the United States—would state a plausible claim for relief even under the majority's restrictive interpretation of the "touch and concern" test; consequently, amendment would not have been futile.

A. **Leave to Amend for Further Factual Development**

Rule 15 governs motions to amend made before trial and provides that "[t]he court should freely give leave when justice so requires." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016) (quoting Fed. R. Civ. P. 15(a)(2)). When the denial of leave to amend is based on grounds of futility, we apply the 12(b)(6) standard to review the sufficiency of the complaint. If the allegations are "'enough to raise a right to relief above the speculative level' and [the] claim for relief is plausible on its face,' . . . amendment would not have been futile." *Id.* at 593 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (additional citations omitted).

The district court stated that Plaintiffs' leave to amend their complaint in light of *Kiobel* would be futile because the court's "conclusion that the relevant conduct by KBR and Daoud occurred outside of the territory of the

---

their complaint to specifically allege these facts functions as a concession that evidence in support of these facts does not exist.

United States" was based on the summary judgment record, and not on the pleadings. The district court's conclusion, however, is based on its erroneous determination that evidence of domestic conduct in the summary judgment record was immaterial. If the district court had properly deemed this evidence material, it could not have concluded that Plaintiffs' allegations, accepted as true, "lacked sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

Moreover, Plaintiffs' counsel clarified at oral argument that the parties were in the middle of discovery when the *Kiobel* decision issued. All discovery up to that point had been taken prior to *Kiobel* and therefore was not focused on U.S.-based conduct. The entire summary judgment record was prepared prior to *Kiobel*, on the basis of which the district court, without a hearing, decided that *Kiobel* mandated dismissal of Plaintiffs' ATS claims.

Plaintiffs argue that they should have been permitted to amend their complaint to allege that U.S.-based managers had control and supervision over the labor flow and knew about the trafficking and did nothing to stop it. The district court had already found that Plaintiffs presented sufficient evidence that "KBR had the authority to exercise control, and did exercise said control, over Daoud's recruitment and supply of laborers." Specifically, Plaintiffs sought to amend their complaint to allege that:

> KBR managers in the United States knew of the use of labor brokers and their practices, received reports of wrongdoing, at all times had power to take corrective action, but declined to do so; that managers in the United States were involved when there was conflict or controversy concerning KBR's operations in Iraq, including incidents regarding subcontractors and/or third country nationals, and that KBR managers in the United States had ultimate authority over such issues.

As discussed above, it is my view that these actions, if borne out by the evidence, constitute "relevant conduct" to the alleged international law violations for which Plaintiffs assert KBR should be held directly liable, and that this relevant conduct is sufficient to satisfy *Kiobel*'s "touch and concern" test. Plaintiffs have already pointed to evidence in the record tending to support these contentions. It is plausible that further reasonable discovery, if permitted, would uncover more evidence of a similar nature. Accordingly, Plaintiffs' proposed allegations to satisfy *Kiobel* are "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and would not have been futile.

## B. Leave to Amend to Allege Aiding and Abetting in the United States

Even accepting the majority's limited reading of *Kiobel*'s "touch and concern" language, it is not apparent that amendment would have been futile. In the alternative, Plaintiffs sought to amend to allege aiding and abetting in the United States in light of *Kiobel*. Concluding that Plaintiffs' theory of indirect liability would have been futile, the majority states, "Plaintiffs argue they would be able to allege facts that satisfy *Al Shimari*, but *Al Shimari* is not the test. . . . [O]ur approach requires analysis of the conduct relevant to the statute's 'focus.' *See Morrison*, 561 U.S. at 266." But Plaintiffs' aiding and abetting claim does not rely on *Al Shimari*. And this is a plausible claim even under the majority's restrictive reading of *Kiobel*.

Plaintiffs assert that they should have been permitted to add allegations of aiding and abetting in the United States because post-*Kiobel* "[c]ourts have uniformly concluded that when the U.S.-based conduct itself constitutes a violation of the ATS, such as aiding and abetting a violation from the United States, the touch and concern test is satisfied."

47

No. 15-20225

As support, Plaintiffs cite the Second Circuit's decision in *Mastafa*, 770 F.3d at 185, whose approach to the "touch and concern" test the majority purports to follow. In *Mastafa*, the Second Circuit held that "relevant conduct" for purposes of the "touch and concern" test is "the conduct of the defendant which is alleged by plaintiff to be either a direct violation of the law of nations or . . . conduct that constitutes aiding and abetting another's violation of the law of nations." *Id.* In other words, "relevant conduct" is conduct that is itself "sufficient to violate an international law norm [satisfying] *Sosa*'s requirements of definiteness and acceptance among civilized nations." *Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring). In *Mastafa*, there were allegations that the defendants engaged in financial transactions in the United States, some through a New York bank account, which indirectly financed the alleged international law violations—torture by agents of the Saddam Hussein regime in Iraq. 770 F.3d at 191. The Second Circuit found these transactions to be "non-conclusory conduct that appears to 'touch and concern' the United States with sufficient force to displace the presumption against extraterritoriality[.]" *Id.* (alterations omitted). Nevertheless, because the Second Circuit had adopted a purposeful *mens rea* standard for aiding and abetting under the ATS, the *Mastafa* court determined that the conduct would fall short of that standard and could not be relied upon to displace the presumption. *Id.* at 192–93.

Plaintiffs here have pled and offered evidence of similar U.S.-based transactions, specifically, KBR's payments to Daoud from the United States, using New York banks. Therefore, if Plaintiffs are able to offer evidence satisfying the *mens rea* standard for aiding and abetting, this conduct would appear to satisfy even the narrow "touch and concern" test.

Unlike the Second Circuit, our Court has not settled on the proper *mens rea* standard for aiding and abetting liability under the ATS. A split exists

among other circuits that have reached the issue as to whether the standard is purpose or a lesser standard akin to knowledge. *Compare Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (purpose); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011) (following *Talisman* in adopting purpose standard) *with Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 39 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013) (knowledge). In *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1024 (9th Cir. 2014), the Ninth Circuit declined to decide the *mens rea* standard, finding that the plaintiffs' allegations would satisfy either standard. It is also unnecessary to reach the issue here because Plaintiffs' proposed allegations would satisfy even the more stringent purpose standard.

The Ninth Circuit's analysis in *Doe I* is instructive. In *Doe I*, the plaintiffs were former child slaves who were forced to harvest cocoa on the Ivory Coast. 766 F.3d at 1017. The defendants maintained and protected a steady supply of cocoa through buyer/seller relationships with Ivorian cocoa farmers. *Id.* By virtue of their economic leverage, they effectively controlled the production of Ivorian cocoa. *Id.* The complaint alleged that they economically benefitted from the use of child slavery, could have stopped or limited the use of child slave labor by their suppliers, did not use their control to do so, but instead offered support that facilitated it. *Id.* at 1025. The Ninth Circuit held that these allegations supported the inference that defendants "acted with the purpose to facilitate child slavery." *Id.* at 1024.

The *Doe I* court was careful to note that merely doing business with the suppliers would not satisfy the purpose standard. The court found, however, that the defendants' alleged plan to *benefit from* the use of child slave labor as a means of reducing their production costs distinguished the case from other ATS decisions where the purpose standard was not met. *Id.* at 1024–25. In those cases, the defendants profited by doing business with known human

rights violators, but were not alleged to have benefited in any way from the underlying human rights violations. *Id.* at 1024 (discussing *Talisman Energy, Inc.*, 582 F.3d at 262–64 and *Aziz*, 658 F.3d at 394, 401). In contrast, the *Doe I* defendants allegedly received a direct benefit from the commission of the international law violation, which bolstered the allegation that they acted with the purpose to support it. *Id.*

The allegations here also support the inference that Defendants acted with the purpose of supporting trafficking and forced labor. Plaintiffs allege that KBR "willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits." Plaintiffs provided evidence that KBR both knew about Daoud's recruitment practices and had the authority to exercise control over them, and did exercise said control. KBR exercised an even greater level of control over the labor flow than the defendants did in *Doe I*. Plaintiffs propose to allege further that U.S.-based managers had control and supervision of the labor flow, knew about the trafficking, and did nothing to stop it. They have already presented evidence that U.S.-based managers received multiple complaints of misconduct, including one concerning *these* Plaintiffs, and made a decision to investigate and terminate the employee who complained. Courts have found the place of decision-making significant to the relevant conduct inquiry when plaintiffs allege indirect liability. *See, e.g.*, *Drummond*, 782 F.3d at 597 (relevant conduct inquiry extends to place of decision-making as opposed to site of actual violation); *Doe v. Exxon Mobil Corp.*, No. CV 01-1357 (RCL), 2015 WL 5042118, at *14 (D.D.C. July 6, 2015) ("Decisions to provide assistance that will have a substantial effect on a violation of customary international law are part of a course of conduct that gives rise to a claim for aiding and abetting under the ATS. Therefore, the site of these decisions is relevant to the Court's application of the presumption against extraterritoriality and the touch and concern test.").

No. 15-20225

Similar to the allegations in *Doe I*, Plaintiffs allege that KBR received a direct benefit from the commission of the international law violations. Plaintiffs would allege various actions in the United States that directly facilitated the violations, including payments to the labor supplier, decisions that perpetuated the wrongdoing, and efforts to conceal it. These allegations would support the inference that Defendants acted with the purpose of facilitating trafficking and forced labor. Plaintiffs' proposed allegations state a plausible claim for aiding and abetting in the United States. It was error for the district court to deny leave to amend as futile.

Accordingly, I respectfully dissent in part.